No. 99-504

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 322

STATE OF MONTANA,

Plaintiff and Respondent,

v.

BYRON KEITH WRIGHT,

Defendant and Appellant.

APPEAL FROM: District Court of the Twelfth Judicial District,

In and for the County of Hill,

The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Robert M. Peterson, Peterson Law Office, Havre, Montana

Jeremy Yellin, Yellin Law Office, Havre, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Tammy K. Plubell,

Assistant Attorney General, Helena, Montana

David G. Rice, Hill County Attorney, Havre, Montana

Submitted on Briefs: August 3, 2000

Decided: December 12, 2000

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1 Byron Keith Wright appeals from a conviction of two counts of Criminal Sale of Dangerous Drugs in the Twelfth Judicial District, Hill County. The sole issue on appeal is whether the District Court erred when it denied Wright's motion to dismiss on grounds of preindictment delay. We affirm.

BACKGROUND

¶2 The Tri-Agency Task Force (Task Force) is a multi-county agency that combines resources to investigate narcotics cases. The Task Force often works with confidential informants to set up drug buys. One of those confidential paid informants, Vicky Azure, claimed that she could purchase narcotics from Byron Keith Wright.

¶3 The first buy between Wright and Azure occurred on November 25, 1997. Sergeant George Tate, a member of the Havre Police Force and on assignment to the Task Force, and several other officers were involved in the transaction. The first buy was termed a credibility buy, which generally meant the buy was used primarily to test the accuracy of the confidential informant's information relating to the ability to purchase drugs.

¶4 On November 25, 1997, the officers met Azure and searched her vehicle and person to confirm that she was not hiding contraband. The Task Force provided cash for the purchase of drugs, and fitted Azure with a body wire for the purpose of assuring her safety and allowing the officers who were monitoring the transaction to maintain control of the situation. Officer Tate testified at the motion to dismiss hearing that the evidentiary value of recording a transaction is merely a secondary purpose of the body wire. Although Azure wore a body wire, and the officers monitored to situation by listening to the audio from the body wire, no recording of the transaction was made.

¶5 Azure was followed in a surveillance vehicle by Sergeant Tate and Agent Shawn Van Vleet, and Sergeant Tate took notes of the entire incident. Officer Tate testified at the hearing that it is standard operating procedure for one surveillance officer to take contemporaneous notes to document routine facts such as the date, time, persons present, and a shorthand version of events in chronological order. Officer Tate also testified that it is standard procedure that once the notes are transferred into a detailed

report, the officers do not keep the contemporaneous notes.

¶6 Wright arrived at his home shortly after Azure arrived. He greeted Azure and they both went inside. Sergeant Tate and Agent Van Vleet listened to the conversation between Azure and Wright via an electronic monitoring device. There were only two persons conversing. Azure purchased two half grams of methamphetamine for $100 from Wright. Azure then inquired about purchasing some heroin, and after some discussion Azure purchased a small amount for $20. Azure also purchased a gram baggie of marijuana for $20. Azure left Wright's residence and turned over the contraband to the officers. The officers also searched Azure and her vehicle, but found no other contraband. The drugs purchased by Azure from Wright were identified by technicians at the Montana State Crime Lab to be heroin, marijuana, and methamphetamine.

¶7 With the cooperation of the Task Force, Azure completed a second drug transaction with Wright on December 8, 1997. The same procedure was followed by the Task Force members for this second purchase. Azure was fitted with a wire, the conversation between Azure and Wright was monitored, and an officer took contemporaneous notes, but the conversation was not recorded. Wright sold Azure one-eighth of an ounce of methamphetamine in exchange for $275.

¶8 The Task Force then contacted the Department of Justice Narcotics Investigation Bureau agents to assist with an undercover buy. Agent Lee Cornell worked with Azure to complete an undercover drug purchase of approximately two grams of cocaine from Wright on December 11, 1997. Azure, Cornell, and Wright met in an agreed-upon parking lot. Wright entered Azure's vehicle and sold Cornell two bindles of cocaine. Both Azure and Cornell wore wire recording devices and the transaction was recorded. An officer also took contemporaneous notes of the incident, which were later compiled by the officers into reports of the incident. During the transaction Wright had a passenger who remained in his truck.

¶9 On December 15, 1997, Agent Cornell worked with the Task Force to complete another controlled buy. Cornell was fitted with a body wire, and then went to the local V.F.W. bar where he met Azure, who was working at the bar. Cornell requested that she call Wright and arrange a purchase for him. During the conversation, Wright agreed to bring two grams of cocaine to the V.F.W. bar for Cornell. Cornell waited outside the bar for a few minutes when Wright drove up alone in his truck. Cornell got into the truck, and Wright drove to a nearby lot and then handed Cornell two ziplock bags which he said contained methamphetamine and cocaine. Cornell paid for the drugs and left. The full transaction was recorded. An officer took contemporaneous notes which were later compiled into reports of the incident. The items purchased from Wright tested positive for cocaine and methamphetamine.

¶10 Approximately one year later, on December 9, 1998, the State of Montana filed a Motion for Leave to File an Information against Byron Keith Wright. The District Court granted the motion and the Information was filed on December 15, 1998, charging Wright with four counts of Criminal Sale of Dangerous Drugs. The four charges were based on conduct alleged to have occurred approximately one year earlier on November 25, December 8, 11, and 15, 1997.

¶11 On April 30, 1999, Wright filed a Notice of Defenses providing notice of his intent to rely on the defenses of entrapment and/or alibi. On the same day, Wright also filed a Motion to Dismiss and Motion for Hearing on the basis of preindictment delay. He argued that as a result of preindictment delay, his constitutional right to due process under the Fifth and Fourteenth Amendments was violated. The State filed a response to the motion to dismiss arguing that any delay which occurred between the dates of the offense and the filing of the Information did not prejudice Wright.

¶12 On June 3, 1999, the District Court held an evidentiary hearing on the motions. Wright presented evidence that defense witnesses relevant to his defense of alibi could not be located. Wright also testified that he had no independent recollection of the transactions because of his drug use at the time. He did recall that "some girls" may have been around during the time frame of the transactions, and wanted to find them because he thought that they could help him remember that period of time. One in particular was present in Wright's pickup truck at the time of the third drug sale. Wright testified that, although he attempted to locate the women, he could not find them.

¶13 Wright also contended that the State had destroyed evidence that was gathered at the time of the offense that would have been relevant to his defense of entrapment. He complained that the destruction of the contemporaneous notes taken by the officer prohibited him from defending himself. He also contended that failure to tape the first two drug sales unduly prejudiced him because of his inability to prove that he was entrapped into selling drugs to Azure.

¶14 The State produced evidence regarding the reason for the delay in prosecution. Sergeant Tate testified that the Task Force wished to use Azure as a confidential informant for as long as possible. If Wright had been immediately charged, the Task Force would have been unable to use her as a confidential informant on other investigations. Sergeant Tate also testified that he did not immediately request a search warrant after Azure first purchased drugs from Wright because he had information that Wright kept his supply of drugs in locations other than his home. Multiple officers also testified that, although contemporaneous notes were destroyed after the preparation of reports, the reports contained all of the information that had been recorded in the notes taken at the time of the drug sales.

¶15 At the conclusion of the hearing, the District Court denied Wright's motion to dismiss. The District Court concluded that Wright had not been prejudiced by any delay between the dates of the alleged offenses and the filing of criminal charges. The court also concluded that Wright was not prejudiced by his failure to find his witnesses, and it was probable that these witnesses would have been inculpatory, rather than exculpatory, due to their participation in drug-related activity with Wright and could not offer testimony that Wright was entrapped and/or that he had an alibi. The court also rejected Wright's allegation that he was prejudiced by the delay because officers had destroyed their field notes after incorporating them into reports.

¶16 The case proceeded to trial on June 17, 1999. At Wright's trial, Azure testified about her relationship with the Task Force, the two times that she purchased drugs from Wright while being monitored by the Task Force, and the two times that she worked with Agent Cornell to enable him to purchase drugs from

Wright. Azure did not keep written notes of the events. At trial, she stated that she did not make any promises, inducements, or assurances to Wright to convince him to sell her drugs. She also testified that the Task Force officers never threatened her to gain her cooperation. Azure's testimony about the four transactions is consistent with that of Sergeant Tate and was corroborated by electronic recording of the two transactions with Officer Cornell. Wright was able to cross-examine Azure regarding her testimony.

¶17 During trial, the State offered to dismiss Counts I and II of the Information in exchange for a guilty plea from Wright to Counts III and IV. Wright subsequently entered a plea of guilty to Counts III and IV, reserving the right to appeal the District Court's denial of his motion to dismiss.

¶18 The District Court granted the State's Motion to Dismiss Counts I and II and accepted Wright's plea of Guilty to Counts III and IV. Wright was subsequently sentenced. He appeals.

## STANDARD OF REVIEW

¶19 Review of preindictment delay is a matter of constitutional law. *State v. Taylor*, 1998 MT 121, ¶ 18, 289 Mont. 63, ¶ 18, 960 P.2d 773, ¶ 18. This Court reviews a district court's conclusion of law to determine whether its interpretation of the law is correct. *State v. Burt*, 2000 MT 115, ¶ 6, 299 Mont. 412, ¶ 6, 3 P.3d 597, ¶ 6.

## DISCUSSION

¶20 Did the District Court err when it denied Wright's motion to dismiss on grounds of preindictment delay?

¶21 Wright argues that the one-year delay occurring from the time of the drug sales between Azure, Cornell, and Wright and the filing of the Information charging him with four counts of Criminal Sale of Dangerous Drugs was an impermissible preindictment delay. Specifically, Wright claims that the impermissible delay hampered his defense because Vicky Azure, the confidential informant, could not accurately recall all of the details of the drug transactions, and that due to the extended delay in charging Wright, he was unable to locate witnesses on his behalf. Wright also argues that the State failed to preserve evidence necessary to his defense.

¶22 The State contends that Wright was not actually and substantially prejudiced by the preindictment delay because the confidential informant testified at trial, and her testimony could be corroborated by audio tapes and the testimony of the undercover officer. The State also argues that it is mere speculation that Wright's potential witnesses would have presented additional information pertinent to his defense. In addition, the State claims that Wright's claim of prejudice based on a loss of evidence is inaccurate. The District Court concluded that no actual prejudice to the Defendant occurred relating to the charged offenses.

¶23 Consideration of a defendant's claim that pre-indictment delay has violated his right to due process

pursuant to the Fifth and Fourteenth Amendments of the United States Constitution involves a two-step process. *Taylor*, ¶ 20. *See also State v. Krinitt* (1991), 251 Mont. 28, 34, 823 P.2d 848, 852. First, the defendant has the burden to show that he has suffered actual and substantial prejudice from the delay. Then, if he has shown sufficient prejudice, we must weigh the reasons for the delay offered by the State, as well as the length of the delay, to determine whether the defendant's rights have been denied. *Taylor*, ¶ 20. A pre-indictment delay will lead to a violation of a defendant's due process rights if it can be said that requiring the defendant to stand trial "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." *Taylor*, ¶ 20 (quoting *United States v. Lovasco* (1977), 431 U.S. 783, 790, 97 S. Ct. 2044, 2048, 52 L. Ed. 2d 752).

¶24 Applying the standard used in analyzing a preindictment delay to the present case, we conclude that the District Court did not err in determining that Wright has not demonstrated that his due process rights were violated. As an initial consideration, we note that the prosecution was commenced within the applicable five-year statute of limitations. *See* § 45-1-205(2)(a), MCA. The primary guarantee against bringing overly stale criminal charges is the applicable statute of limitations. *Krinitt*, 251 Mont. at 33-34, 823 P.2d at 851 (citing with approval *U.S. v. Marion* (1971), 404 U.S. 307, 322-24, 92 S. Ct. 455, 463, 30 L. Ed. 2d 468).

¶25 We look next to the issue of whether the defendant suffered actual, substantial prejudice from the one-year delay in prosecution. The defense relied upon a theory of entrapment and/or alibi during the trial. Wright contends that he could not prove entrapment and/or alibi because due to preindictment delay, Azure could not accurately recite her statements to Wright, the delay led to the loss of discovering potential witnesses to bolster his credibility at trial, and law enforcement failed to preserve relevant evidence.

¶26 Wright first claims that he suffered actual and substantial prejudice because Vicky Azure, the confidential informant, could not accurately remember significant details of the discussion that prompted the drug sale transactions that occurred between Wright and Azure, which prohibited Wright from presenting an entrapment defense. We disagree. As the State noted, Azure testified at trial that she did nothing to induce Wright into selling her drugs other than ask him for the drugs. Wright was able to cross-examine Azure and was free to present other relevant evidence to prove entrapment.

¶27 There can be no guarantee that Azure's memory would have been substantially different if the trial had been several months before or after it actually occurred. In addition, the officers involved in the controlled drug purchases recorded the two transactions between Wright and Cornell to which Wright pled guilty. The failure of Azure to testify to her exact words during the drug sale due to a preindictment delay, when other evidence was presented that bolstered her testimony, did not cause Wright actual prejudice.

¶28 Wright also claims that the State's delay in charging him prevented him from contacting potential witnesses who would have testified in support of his alibi or entrapment defense. We disagree. Wright's

assertion that the missing potential witnesses could have testified in support of an alibi and/or entrapment defense is mere speculation. Wright himself testified that he could not remember the events in question, and thus he could not say whether the accusations in the Information were accurate.

¶29 The District Court found that it was more probable than not that the potential witnesses would tend to be inculpatory because they were doing drugs with the Defendant at the time and would be subject to cross-examination. Although one of the potential witnesses was present in Wright's truck at the time of one of the drug sales, the District Court found that the potential witness was not in a position to either testify that Wright was entrapped or that Wright didn't actually make the sale because "he was not right there at the sale but in a different place." Wright's "bare speculation" that a missing witness's testimony would have been exculpatory is insufficient to prove actual prejudice. *See Taylor*, ¶ 24. Thus, we conclude that the District Court did not err in determining that a mere loss of potential witnesses in this case does not constitute actual and substantial prejudice due to preindictment delay.

¶30 In addition, Wright attempts to prove prejudice by asserting that the officers failed to preserve evidence when they did not tape-record the first two sales transactions, and destroyed evidence by destroying their contemporaneous notes after compiling their reports. Wright fails to show actual prejudice when the officers failed to tape-record the first two sales transactions. Wright pleaded guilty, and was sentenced solely on the basis of Counts III and IV, drug sale transactions that were fully recorded by law enforcement. Thus, we will not address the sufficiency of the evidence for Counts I and II, which were based on unrecorded alleged drug sales.

¶31 Further, we have not directly discussed the need for law enforcement officers to retain notes maintained contemporaneously with events as they occur. Although we continue to be of a mind that destruction of field notes may prove problematic for a successful prosecution, it is not our province to set agency policy. Suffice it to say that the officers would have likely disposed of their notes immediately after transferring the information into a report. Thus, regardless of the length of time between the drug sales and the filing of charges, the field notes would have been destroyed shortly after the drug sales and not have been available to Wright. Wright's claim that the failure to preserve evidence caused him preindictment prejudice is misplaced.

¶32 Even if we recharacterize Wright's claim as one not based on preindictment delay, we have previously held that in order to reverse a conviction based on allegations that the State failed to produce evidence, the defendant must show that the lost or destroyed evidence had exculpatory value that would have changed the outcome of the trial. *See, e.g. State v. West* (1992), 252 Mont. 83, 87, 826 P.2d 940, 943; *State v. Brown*, 1999 MT 133, ¶ 28, 294 Mont. 509, ¶ 28, 982 P.2d 468, ¶ 28. Audio tapes of the transactions, as well as testimony from the confidential informant form the basis for Wright's convictions. Wright fails to show that existence of the contemporaneous notes would have changed the outcome of the trial.

¶33 Wright has failed to prove that he was prejudiced by any delay that occurred between the time he committed the offenses and the time the State filed charges against Wright. Thus, we need not examine

the State's reason for the delay.

¶34 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART