
DA 07-0333

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 61

STATE OF MONTANA,

Plaintiff and Appellee,

v.

JOSHUA DAVID GIDDINGS,

Defendant and Appellant.

APPEAL FROM:     District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC 2005-260
Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Jim Wheelis, Chief Appellate Defender; Joslyn M. Hunt, Assistant Appellate
Defender, Helena, Montana

For Appellee:

Hon. Steve Bullock, Montana Attorney General; Tammy Plubell, Assistant
Attorney General, Helena, Montana

Leo Gallagher, Lewis and Clark County Attorney, Helena, Montana

Submitted on Briefs:  December 3, 2008

Decided:  March 3, 2009

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    Joshua David Giddings (Giddings) appeals his convictions in the First Judicial District, Lewis and Clark County, for deliberate homicide, felony tampering with or fabricating physical evidence, and felony criminal possession of dangerous drugs. We affirm.

¶2    We review the following issues on appeal:

¶3    *Did the District Court properly deny Giddings's motion to dismiss based on the State's alleged intentional destruction of exculpatory evidence?*

¶4    *Did the District Court properly deny Giddings's motion to dismiss based on the State's alleged failure to provide discovery?*

¶5    *Did the District Court abuse its discretion when it allowed the State to add two witnesses in the month preceding the trial?*

¶6    *Did the District Court abuse its discretion when it denied Giddings's motion for a mistrial based on the State's alleged violation of the District Court's order in limine?*

¶7    *Did the District Court abuse its discretion when it limited Giddings's cross-examination of Richard Alan King?*

¶8    *Did the District Court prejudice Giddings by allowing a videotape of a police interview with Giddings into the jury room during deliberations?*

¶9    *Does the doctrine of cumulative error warrant reversal of Giddings's conviction?*

¶10    *Did the District Court illegally sentence Giddings to life without the possibility of parole?*

## FACTUAL AND PROCEDURAL BACKGROUND

**Prelude to the Murder**

¶11    Randy Vook (Randy) found his daughter, Amy Rolfe (Amy), dead under a pile of laundry when he arrived at home from work on Friday, July 22, 2005. Amy lived in her parent's home with her boyfriend, Mike Mix (Mix), and her three young sons. Investigators reconstructed the events during the week leading up to Amy's murder. Giddings spent the week under the influence of methamphetamine. He sought to sustain his methamphetamine binge by obtaining more money and more drugs.

¶12    The week of Amy's murder, Ryan Frankforter (Frankforter) gave Giddings $350. Frankforter expected seven grams of methamphetamine in return. Giddings delivered half of the methamphetamine. Frankforter loaned Giddings clothing, including the same white Ecko t-shirt that officers later found under Amy's dead body. Giddings still had not delivered the remaining methamphetamine by the evening before Amy's murder. Frankforter found Giddings gambling. Frankforter was angry, but Giddings assured him that many people around town owed him money.

¶13    Giddings and Frankforter went to Codie Whitehouse's (Whitehouse) apartment where Richard Alan King was staying. Giddings was "a basket case." He was under the influence of drugs. Giddings asked King if he wanted to give them money for methamphetamine. King said he already had given all his money to Mix. Mix had just left. King informed Giddings that Mix was going on a drug run and would be back the next day. Giddings and Frankforter left. King fell asleep on Whitehouse's couch.

3

¶14    Giddings next tracked down Levi Gadaire (Gadaire). Gadaire owed Giddings money. Giddings thought that Gadaire had methamphetamine. Giddings was willing to take the drugs in lieu of money. Gadaire claimed to have neither. Giddings and Frankforter also went to Erika Saunders's (Saunders) apartment. Giddings had stayed at Saunders's apartment during the week leading up to Amy's murder. Saunders overheard Giddings and Frankforter discussing a drug deal.

¶15    Frankforter followed Giddings around until the early morning hours. They returned to Frankforter's house at around 5:00 a.m. on the morning of Amy's murder. Frankforter remarked that his wallet was missing. Giddings said he thought that it was on the dash of Frankforter's car. Frankforter gave Giddings his car keys to get the wallet. Giddings never returned. Frankforter's dad woke him up at about 8:00 a.m. because Frankforter's car was blocking his truck. Frankforter could not find his car keys or wallet.

¶16    On the day that Amy died, Candice Vook (Candice), Amy's mom, woke Amy so that Amy could attend an 8:30 a.m. work meeting. Mix had left to go to his job as a foreman for a roofing company. Candice answered a phone call from Giddings before Amy left for the meeting. Giddings asked to speak to Amy. Amy was standing beside Candice in the kitchen, but Candice told Giddings that Amy was not there and instructed him not to call again. Amy attended her work meeting and called her mom at about 10 a.m. to tell her that she was running errands.

¶17    Chris Rolfe (Rolfe), Amy's ex-husband and the father of her three sons, stopped by the Vook's residence to arrange a visit with his sons. Amy and Rolfe had an amicable relationship. Candice left home at around 1:30 p.m. Amy dropped the boys at Rolfe's home.

4

Amy told Rolfe that she was going to pay the day care bill. She never made it to the day care provider to pay the bill.

¶18    Giddings arrived at Mary MacDonald's apartment between 1:30 p.m. and 2:00 p.m. looking for her brother Joe MacDonald (MacDonald). Giddings appeared to be under the influence of drugs. He was wearing a white Ecko t-shirt.

¶19    Mix and his work partner, Todd Anderson (Anderson), were leaving a gas station at about 3:00 p.m. when Anderson's van died. Mix called Amy. She agreed to give them a ride, but she never showed up. Mix called her repeatedly without success. Mix and Anderson eventually got the van started and went to their next job. Giddings called MacDonald at about this time from Amy's cell phone. MacDonald did not know Amy. Giddings seemed agitated, out of breath, and wanted a ride. MacDonald refused.

**The Immediate Aftermath**

¶20    Randy arrived home at about 5:10 p.m. and saw Amy's car. He discovered Amy's body and called 911. Officer Hagen of the Helena Police Department arrived at the Vook's residence at about 5:30 p.m. Amy's pants were down below her waist. Blood was on her face and shirt. Paramedics arrived and confirmed that Amy was dead. The contents of Amy's and her children's bedrooms were scattered on the floors of those rooms. The police found Amy's body partially stuffed in a sleeping bag. A comforter beneath Amy smelled of urine. Red staining and fecal material covered the comforter. A white Ecko t-shirt lay underneath the comforter. The t-shirt was soaking wet and did not smell of urine.

¶21    John Foster (Foster) picked up his girlfriend, Jennifer Casman (Casman), from work at about 5:30 p.m. Casman dropped Foster at home and went to her mother's house to pick

5

up her children. Someone knocked on the back door while Foster waited for Casman to return. Foster opened the door to find Giddings standing on the porch. Giddings was wet and he wore no socks or shoes. Giddings was nervous, jittery, and "high."

¶22    Foster allowed Giddings to enter the house. Giddings told Foster that "Mike Mix just killed his girlfriend." Giddings was "panicky." He told Foster that he could not see how someone could be "thrashed around and beaten like that." Giddings described a strong odor of feces. Giddings claimed that he had seen blood vessels "popped out on Amy's lips" when Mix killed Amy. Giddings told Foster that Amy was under some "towels and things" in the laundry room. Giddings called Donald Duff (Duff) at 5:50 p.m. to ask for a ride. Duff's girlfriend did not like Giddings, so Duff declined.

¶23    Foster called Casman at 5:56 p.m. and told her to hurry home because he "wanted to get [Giddings] out of there." Foster told Casman to have the kids immediately go to their rooms when they arrived. Foster loaned Giddings a shirt and a pair of shorts. Giddings took off his clothes, including his Sponge Bob boxers, in the kitchen. Giddings was in a hurry. He cried off and on. Giddings asked for a plastic bag. He said he had some things to put in the plastic bag. Giddings went outside and then returned looking for the Sponge Bob boxers.

¶24    After Casman arrived, Giddings placed a full plastic bag and some cardboard boxes in the trunk of Casman's and Foster's car. The group departed for Duff's trailer with Casman driving. Giddings sat in the backseat. He rocked back and forth and cried intermittently. Casman and Foster noticed a gas or turpentine smell coming from the trunk of the car.

¶25    Casman drove Giddings to Duff's trailer. When they arrived, Foster quickly got out of the car and opened the trunk. Giddings asked Foster for a ride to the mountains so that he

6

could burn the contents of the trunk. Foster refused. Giddings began unloading the trunk. He tried to hand Foster a carpenter's level. Foster refused to touch the level because he "sensed something was bad." Giddings tearfully gave Foster a hug and asked him not to tell anyone about any of "it" until it came out on the news.

¶26 Giddings walked towards Duff's door. He carried the plastic bag, the box, and the level. Duff told Giddings "you're not bringing that in here." Giddings wore cutoffs and a t-shirt. He wore no shoes or socks and was "highly agitated."

¶27 Duff asked Giddings "what's going on?" Giddings responded "It isn't good. It isn't good." Giddings put his head down and cried. Giddings provided Duff with the following account. Mix had called Giddings to ask for help. Giddings claimed that when he arrived at the Vook's house Mix was unable to talk. Giddings heard gurgling from under the sheets. He pulled the sheets back and saw Amy lying on her back with blood all over her face and mouth. Giddings got scared and grabbed a rag and cleaner and sprayed down everything that he had touched. He fled.

¶28 Casman and Foster drove from Duff's trailer to the police station to report what had happened. They arrived at the police department at 6:35 p.m. Detective Ekola searched their car. He smelled a strong odor of a flammable material, such as gasoline. Several police officers drove to Duff's trailer.

**The Arrest**

¶29 Duff testified that Giddings "ran back and forth looking out the windows" of Duff's trailer. Giddings stated "There they are, there they are," when the police officers arrived. The officers knocked on Duff's door. The officers yanked Duff out of the house when he

7

opened the door. Duff heard the door close and lock. Duff gave the police permission to break down the door and enter his trailer. The officers forced the door open and called to Giddings. Giddings emerged wearing nothing but a towel. He looked as if he had just gotten out of the shower. Officer Hagen handcuffed Giddings and sat him on a chair inside the trailer.

¶30 Duff took the officers to his shed. The officers found a large plastic bag and a white t-shirt wrapped around some other items sitting on top of a box. Detective Ekola placed into evidence the plastic bag and its contents, a carpenter's level, and some cardboard boxes that the officers had removed from the shed. The items smelled of the same chemical odor as that emanating from the trunk of Foster's car.

¶31 The police arrested Giddings and transported him to the Law Enforcement Center. Giddings told Deputy Mlekush that he hoped to be able to tell his side of the story. Giddings claimed that he often helped his friends and it ended up getting him into trouble, similar to an incident earlier that day. Giddings heard a loud angry voice while he was at the Law Enforcement Center. He declared "That's Mike." Giddings became pale and tense. He asked Deputy Mlekush "Could you?" Giddings paused and said "No, we're not supposed to talk about that." Giddings then asked," Could you – could you just tell me if she lived?" Giddings began to shake and cry. He curled into a ball.

**The Investigation**

¶32 Lieutenant Jeseritz met with Mix and Anderson on the evening of Amy's murder. Mix was shaken and distraught. Lieutenant Jeseritz considered Mix a suspect at that point.

8

Mix agreed to a formal interview. He cooperated fully. Detective Ekola later conclusively verified Mix's and Anderson's locations on the afternoon of Amy's murder.

¶33 Giddings and Mix grew up together, but at the time of Amy's death Mix did not consider Giddings a trusted friend. Mix admitted that he bought and sold methamphetamine. Before he moved in with the Vooks, he had a safe where he stored his drugs and cash. Giddings had watched Mix get drugs and money from the safe. Mix had obtained methamphetamine for King in the days leading up to Amy's murder. Mix had sold King one-half a gram of methamphetamine on the evening of July 19, 2005. Giddings was with King at the sale.

¶34 After Giddings's arrest, Duff's girlfriend found a planner belonging to Giddings at Duff's residence. Inside the planner were papers, Frankforter's missing keys, and a syringe. Law enforcement also recovered Frankforter's empty wallet. Frankforter had $150 in the wallet when he was with Giddings on the morning of Amy's murder.

¶35 Dr. Gary Dale, the State Medical Examiner, conducted an autopsy of Amy. Dr. Dale concluded that Amy had died of homicidal violence that included blunt force injuries to her head and neck. Dr. Dale found fecal material smeared around Amy's waist and thigh area and in the crotch of her panties. Her upper trousers were damp, consistent with urine soiling. Investigators had recovered from beneath Amy's body a can of Pledge cleaning spray, with the bottom damaged. Dr. Dale concluded that the base of the Pledge can was consistent with the pattern of some of the injuries visible on Amy's scalp. Dr. Dale determined that a carpenter's level, like the one recovered in Giddings's possession, could have caused some of Amy's other neck and head injuries. Dr. Dale was unable to determine conclusively

9

which injury had caused Amy's death. He could not rule out asphyxia, based on the position of Amy's body and the fact that Amy had lost control of her bowels. Dr. Dale stated that fear also could have caused Amy to lose control of her bowels.

¶36 Police found Amy's purse and cell phone, clothing items, and a pair of black Adidas tennis shoes in the plastic bag that police had recovered from Duff's shed. Subsequent testing revealed Amy's blood on the bottom of the black tennis shoes. Forensics analysts found a mixture of Amy's and Giddings's DNA inside the tennis shoes. Forensics analysts also discovered Amy's DNA on the Ecko t-shirt that police had found under Amy's body. Giddings's DNA was on the collar of the Ecko t-shirt.

¶37 The plastic bag also contained a bottle of cleaner and a yellow plastic coffee cup with a blue wash cloth tucked inside. These items came from the Vook's residence. The coffee cup appeared to contain feces. The carpenter's level that police recovered from Duff's shed matched a level missing from the Vook's kitchen. Crime lab fingerprint examiners found Giddings's left index fingerprint on the level.

**Giddings's Statements while in Jail**

¶38 Giddings called King after his arrest to ask King to take care of some things. King visited Giddings in jail. King told Giddings that the police wanted to talk with King. King expressed his concern about the interview due to his lack of an alibi. He claimed to have been home alone sleeping at the time of Amy's murder. Giddings changed his story about Amy's death after he learned that King did not have a solid alibi. Giddings now claimed that King had killed Amy, although Giddings previously had insisted that Mike Mix had killed her.

10

¶39 Witnesses said that Giddings also had told inconsistent stories about Amy's murder while he was in jail awaiting trial. Shannon Rawlins (Rawlins), Ryan Mulcahy (Mulcahy), and John Gillette (Gillette) each testified about statements Giddings made while they were in jail together. Giddings told Rawlins that he remembered going to Amy's house for methamphetamine or money. Giddings said he remembered arguing with Amy and striking her, but then blacked out. Giddings claimed that he next remembered leaving the house covered in blood. Rawlins said that Giddings offered to pay him around $3000 if after Rawlins's release from jail he would get rid of Joe MacDonald, a witness in Giddings's case.

¶40 Giddings told Mulcahy that King had committed the murder and that Giddings had attempted only to dispose of the evidence. Giddings consistently denied killing Amy in his conversations with Mulcahy or even having been present when she was killed. Giddings told Gillette that he had stopped by the Rolfe residence to collect money from a methamphetamine deal, and that Mix was not there. Giddings said that he had argued with Amy, and that he had hit her repeatedly until she fell down. Gillette testified that Giddings previously had told him various contradictory stories about Amy's murder, including that he had not been involved at all, and that Mix had been involved in cleaning up the murder.

¶41 The State charged Giddings on July 27, 2005, with Count I - Deliberate Homicide, Count II - Tampering With or Fabricating Physical Evidence, and Count III - Possession of Dangerous Drugs and Solicitation. The State later added Count IV - Tampering with a Witness/Informant. The trial began on January 8, 2007, after numerous continuances. The jury convicted Giddings of Counts I through III and found Giddings not guilty of Count IV.

11

The court sentenced Giddings to life in prison without the possibility of parole. Giddings appeals.

## STANDARD OF REVIEW

¶42 The denial of a motion to dismiss in a criminal case presents a question of law that we review de novo. *State v. Price,* 2002 MT 229, ¶ 9, 311 Mont. 439, 57 P.3d 42. We review a district court's discretionary rulings, including evidentiary rulings, decisions to deny a motion for a mistrial, and decisions to endorse witnesses, for an abuse of discretion. *State v. Duncan*, 2008 MT 148, ¶ 37, 343 Mont. 220, 183 P.3d 111. A district court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or so exceeds the bounds of reason as to work a substantial injustice. *McCormack v. Andres*, 2008 MT 182, ¶ 22, 343 Mont. 424, 185 P.3d 973. We review criminal sentences that include at least one year of actual incarceration for legality only. We consider whether the sentencing court had the statutory authority to impose the sentence and whether the sentence falls within the parameters set by the applicable sentencing statutes. *State v. Rosling*, 2008 MT 62, ¶ 59, 342 Mont. 1, 180 P.3d 1102.

## DISCUSSION

¶43 *Did the District Court properly deny Giddings's motion to dismiss based on the State's alleged intentional destruction of exculpatory evidence?*

¶44 Detective Ekola interviewed King about Amy's homicide on four separate occasions. The first interview lasted approximately one hour. King adamantly objected to having Detective Ekola record the interview. Detective Ekola elected not to record the interview so that he could develop a rapport with King. Detective Ekola admitted that he could have

12

taped the interview without King's knowledge. Detective Ekola took handwritten notes. He destroyed the notes after typing a summary of the information that he deemed valuable.

¶45    King allowed Detective Ekola to tape the second interview. Detective Ekola recorded the interview using a 90-minute tape with approximately 45 minutes on each side. Detective Ekola failed to recognize that the tape had stopped recording after 45 minutes. The interview continued for approximately 15 minutes after the tape had stopped. Detective Ekola took notes throughout the interview. He included the information that he determined to be valuable in a typed report.

¶46    King's third and fourth interviews each lasted approximately 30 minutes. Detective Ekola recorded both interviews. The recording of the fourth interview is of poor quality. Detective Ekola destroyed his notes of the interviews after summarizing in typed reports the issues that he deemed important. The State produced each of Detective Ekola's typed reports to Giddings.

¶47    Giddings claims that Detective Ekola's actions violated his due process rights. Giddings points to Detective Ekola's intentional destruction of his handwritten interview notes, his failure to tape-record the first interview with King, and his failure to tape-record fully the second interview with King. The State's suppression of material evidence favorable to a defendant violates the defendant's Fourteenth Amendment guarantee of due process. *State v. Johnson*, 2005 MT 318, ¶ 12, 329 Mont 497, 125 P.3d 1096 (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963)).

¶48    The party seeking to establish a *Brady* violation in Montana bears the burden of establishing that:

13

(1) the State possessed evidence, including impeachment evidence, favorable to the defense; (2) the petitioner did not possess the evidence nor could he have obtained it with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed, a reasonable probability exists that the outcome of the proceedings would have been different.

*Johnson*, ¶ 12 (citing *Gollehon v. State*, 1999 MT 210, ¶ 15, 296 Mont. 6, 986 P.2d 395). The deliberate or intentional suppression of exculpatory evidence by the prosecution constitutes a per se due process violation in Montana. *State, City of Bozeman v. Heth*, 230 Mont. 268, 272, 750 P.2d 103, 105 (1988). Where the lost evidence is only potentially exculpatory, rather than apparently exculpatory, the defendant must show bad faith by the State in order to establish a due process violation. *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S. Ct. 333, 337 (1988).

¶49    Giddings asserts that "we can never know" whether the notes contained exculpatory information. According to Giddings, "[t]he handwritten notes could have contained exculpatory evidence. They could not have. But that was not the point. What mattered was the fact that evidence existed in Giddings's case he could not use as part of his defense due to Ekola's intentional acts." Giddings's opinion of "the point" notwithstanding, a defendant must meet the well-established standards delineated above, ¶ 48, in order to prove that the State violated his due process rights by intentionally destroying exculpatory evidence. *Johnson*, ¶ 12; *Gollehon*, ¶ 15.

¶50    Giddings provides no evidence to establish that Detective Ekola's handwritten notes contained information favorable to the defense. *Johnson*, ¶ 12. Giddings likewise has not shown that a reasonable probability exists that his access to the notes would have changed

the outcome of the trial. *Johnson*, ¶ 12. Giddings simply argues that the notes may have contained information favorable to the defense. Giddings's speculation and conjecture about the exculpatory value of the notes and the possibility that those notes might have changed the outcome of the trial fails to establish a due process violation. *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97; *Johnson*, ¶ 12.

¶51 Giddings likewise has not established that Detective Ekola's conduct constituted bad faith. *Youngblood*, 488 U.S. at 57-58, 109 S. Ct. at 337. Detective Ekola testified that he destroyed the notes only after transcribing all relevant information into his formal report. Giddings concedes that "Ekola was not legally required to tape-record the interview nor was he legally required to keep notes. He did not intentionally erase a tape or intentionally fail to flip the tape." Giddings asserts, however, that Detective Ekola was legally required to keep his handwritten notes once he took them as they may have contained exculpatory information. Giddings provides no legal authority to support this proposition. Giddings states that "we will never know what the notes said because Ekola intentionally destroyed them." Giddings adds that Detective Ekola's actions caused Giddings to have "no means of determining what King actually said to police." Giddings's unsupported assertions and suppositions do not establish the bad faith necessary to prove a due process violation based on suppression of potentially exculpable evidence under *Youngblood*, 488 U.S. at 57-58, 109 S. Ct. at 337.

¶52 The State's negligent suppression of evidence also may constitute a denial of a defendant's due process rights. *Heth*, 230 Mont. at 272, 750 P.2d at 105. Negligently suppressed evidence must be "material and of substantial use, vital to the defense, and

exculpatory" in order to violate due process. *State v. Weaver*, 1998 MT 167, ¶ 54, 290 Mont. 58, 964 P.2d 713. Evidence is exculpatory if it "would have tended to clear the accused of guilt." *Heth*, 230 Mont. at 272, 750 P.2d at 105 (citing *Brady*, 373 U.S. 83, 83 S. Ct. 1194; *State v. Patterson*, 203 Mont. 509, 512-13, 662 P.2d 291, 293 (1983)).

¶53 Giddings attempts to meet his burden by pointing to *State v. Swanson*, 222 Mont. 357, 722 P.2d 1155 (1986). In *Swanson*, a DUI defendant exercised his statutory right to an independent blood test. Police allowed the vial of blood to set on the counter for several days, rendering it worthless. *Swanson*, 222 Mont. at 358-59, 722 P.2d at 1156-57. We determined that the police had a duty to preserve the evidentiary value of the blood once they took the sample. The spoiled vial of blood had no potentially exculpatory value. *Swanson*, 222 Mont. at 362, 722 P.2d at 1158.

¶54 Giddings, on the other hand, still possessed Detective Ekola's typed reports that summarized each interview. The State correctly observes that Giddings also had the ability to interview all of the witnesses whom Detective Ekola had interviewed. Giddings could have interviewed Detective Ekola. Giddings cross-examined Detective Ekola at trial. Giddings's analogy to *Swanson* falls short. Giddings likewise has failed to demonstrate that the existence of Ekola's contemporaneous notes would have changed the outcome of the trial. *State v. Wright*, 2000 MT 322, ¶ 32, 302 Mont. 527, 17 P.3d 982. Giddings has not established that the State violated his due process rights by intentionally or negligently suppressing exculpatory evidence. The District Court properly denied Giddings's motion to dismiss based on the State's alleged destruction of exculpatory evidence.

16

¶55 *Did the District Court properly deny Giddings's motion to dismiss based on the State's alleged failure to provide discovery?*

¶56 Giddings argues that the State violated his due process right to a fair trial by withholding discovery material. He contends that the State's failure to disclose impeachment evidence and other evidence favorable to Giddings violated *Brady*, 373 U.S. 83, 83 S. Ct. 1194. Giddings also claims that the State's failure to follow the District Court's discovery orders violated his right to confrontation by depriving him of the information necessary to conduct a full cross-examination. Giddings finally alleges that the State's failure to provide discovery deprived him of effective assistance of counsel that impinged the fundamental fairness of his trial. The discovery consisted in pertinent part of the criminal histories and numerous related documents from Shannon Rawlins and a number of the State's witnesses, State Crime Lab information, FBI lab information, and DNA information from Myriad Laboratories in Salt Lake City.

¶57 Giddings filed the last of a series of motions on December 21, 2006, that sought to compel the State to provide various items of discovery, or alternatively asking the District Court to dismiss the information, or to preclude the State from calling certain witnesses at trial. The District Court conducted hearings connected to Giddings's discovery demands on September 13, 2006, December 8, 2006, and January 2, 2007. The court summarily denied Giddings's requests. Giddings filed a petition for a writ of supervisory control on January 5, 2007. This Court halted the trial proceedings in the middle of voir dire in order to consider Giddings's petition. We denied Giddings's petition on January 11, 2007. *Giddings v. First Judicial District*, No. OP 07-0012 (Jan. 11, 2007).

17

¶58 Giddings and the State debate what evidence the State actually disclosed to Giddings, when the State disclosed the evidence, and who was at fault for the alleged delays. We need not determine conclusively whether Giddings's or the State's version of events is accurate. Even assuming that Giddings's version is accurate, he has failed to meet his burden of proving error on appeal. *State v. Hicks*, 2006 MT 71, ¶ 22, 331 Mont. 471, 133 P.3d 206; *see also State v. Bailey*, 2004 MT 87, ¶ 26, 320 Mont. 501, 87 P.3d 1032.

¶59 Giddings's argument focuses on two issues: 1) that his counsel did not have sufficient time to analyze scientific evidence to find exculpatory information, and 2) that his counsel did not have the information necessary to impeach effectively the State's witnesses. Giddings argues that the withheld information "clearly constitutes *Brady* material." Giddings fails to establish, however, the specific elements required to demonstrate a *Brady* violation. *Johnson*, ¶ 12.

¶60 Giddings filed his notice of appeal with this Court on May 29, 2007. We granted Giddings five extensions to file his opening brief. He filed his brief on February 5, 2008, more than one year after the jury had found him guilty. Giddings, with the benefit of an additional year, fails to establish with any specificity that the State possessed evidence favorable to the defense. *Johnson*, ¶ 12. Giddings has not established that any of the evidence was exculpatory or that a reasonable possibility exists that the evidence would have changed the outcome on appeal. *Johnson*, ¶ 12. He fails to point to specific evidence that "would have tended to clear the accused of guilt." *Heth*, 230 Mont. at 272, 750 P.2d at 105. Giddings instead makes sweeping generalizations and broad accusations that fail to meet the specific elements necessary to prove a *Brady* violation. *Johnson*, ¶ 12.

18

¶61 Giddings likewise fails to establish that the State's actions deprived him of effective assistance of counsel and his right of confrontation to the point of depriving him of a fair trial. Randi Hood, a lawyer with more than 30 years of experience, became Giddings's counsel on July 27, 2005. The State filed its information on August 9, 2005, and the District Court set the first trial date for January 9, 2006. The court continued the trial date until March 20, 2006. The District Court appointed Al Avignone, another lawyer with extensive trial experience, on February 6, 2006, as co-counsel to assist Ms. Hood. The court then continued the trial a second time until September 25, 2006. On July 27, 2006, the court vacated the September 25, 2006, trial date to accommodate Giddings's request for more time to analyze the evidence. The court on July 28, 2006, appointed Mr. Avignone's partner, Lisa Banick, to act as Giddings's third counsel. The parties agreed to try the case on January 8, 2007, approximately 17 months after the District Court first had appointed Ms. Hood as Giddings's counsel.

¶62 We stated in *State v. Henderson*, 2004 MT 173, ¶ 8, 322 Mont. 69, 93 P.3d 1231, that counsel must do more than merely accompany the defendant in court. We emphasized the defense counsel's duty to advocate on behalf of the defendant. *Henderson*, ¶ 8. The District Court continued Giddings's trial for one year beyond the first trial date. Giddings's trial lasted for more than two weeks. His lawyers, with decades of combined experience, cross-examined the State's witnesses at length and repeatedly impeached their testimony. Giddings's lawyers effectively advocated for him, and did far more than merely accompany him in court. *Henderson*, ¶ 8.

19

¶63 Giddings has failed to meet his burden of proving error on appeal. *Hicks*, ¶ 22. He has not established that the State's alleged withholding of discovery evidence violated *Brady*, 373 U.S. 83, 83 S. Ct. 1194; *Johnson*, ¶ 12. He also has failed to establish that the State's actions deprived him of effective assistance of counsel or his right to confront his accusers. The District Court properly denied Giddings's motion to dismiss.

¶64 *Did the District Court abuse its discretion when it allowed the State to add two witnesses in the month preceding the trial?*

¶65 Gillette and Mulcahy both testified about statements Giddings made to them while they were in county jail. *See* ¶¶ 39-40. Gillette initially spoke with Detective Ekola in September or October of 2005. Gillette told Detective Ekola that Giddings and King had been involved in Amy's murder. Gillette offered to provide details only if Detective Ekola helped him with a parole violation issue in New York. Detective Ekola declined Gillette's offer to provide information in exchange for favored treatment. Detective Ekola documented this information in a report that the State provided to Giddings. Gillette approached Detective Ekola approximately one year later and offered to testify without receiving any compensation.

¶66 The State moved to add Gillette as a witness on December 5, 2006. Giddings filed an objection to the State's motion on December 19, 2006, or alternatively, a motion to continue the trial. The State moved to add Mulcahy as a witness on December 21, 2006. Giddings filed his second motion to dismiss on December 21, 2006. The District Court considered the matter at the January 2, 2007, pretrial hearing. Giddings argued that the District Court should not allow Gillette or Mulcahy to testify because both were jailhouse informants and

20

because the State had failed to provide proper discovery. The District Court allowed both witnesses to testify at trial.

¶67 Giddings argues that allowing Gillette and Mulcahy to testify violated his right to a fair trial. Giddings points to the inherent unreliability of jailhouse snitches and argues that cross-examination does not protect adequately a defendant's rights. Giddings also claims that he did not request extensive information on Mulcahy and Gillette because the prosecutor had stated on August 4, 2006, that he would not be calling as witnesses any jailhouse informants other than Shannon Rawlins. Giddings argues therefore that he lacked sufficient time or information to prepare for, and properly impeach, Gillette and Mulcahy.

¶68 The State challenges Giddings's depiction of Gillette and Mulcahy as jailhouse informants. The State suggests that a government informant is "motivated by personal gain rather than some independent law enforcement purpose." *State v. Grimes*, 1999 MT 145, ¶ 45, 295 Mont. 22, 982 P.2d 1037. The State contends that this definition does not apply to Mulcahy or Gillette, because neither witness testified in return for inducements or other type of favorable treatment.

¶69 The appellant bears the burden to establish error by a district court. The appellant must establish such error with legal authority. *Bailey*, ¶ 26. Giddings provides no evidence to refute the State's claim that Gillette and Mulcahy did not receive compensation or any other form of personal gain for their testimony. *Grimes*, ¶ 45. Giddings also provides no legal authority to contradict the State's definition of jailhouse informant. *Bailey*, ¶ 26.

¶70 The relevant issue then is whether the District Court abused its discretion when it allowed the State to add Gillette and Mulcahy as witnesses. We held in *State v. Grindheim*,

21

2004 MT 311, ¶ 34, 323 Mont. 519, 101 P.3d 267, that the district court did not abuse its discretion when it granted the State's motion to add a witness five days before trial. We emphasized that neither the witness nor the content of the witness's testimony was a surprise to the defense as the State had provided the defense with a copy of the witness's statement about four months before the trial. *Grindheim*, ¶¶ 26, 33. In *Bailey*, ¶ 21, we determined that the district court did not abuse its discretion in granting the State's motion to add an expert witness four days before trial. We emphasized that the prosecution had provided defense counsel with a full opportunity to examine its files. *Bailey*, ¶ 14.

¶71 Giddings likewise knew that Gillette and Mulcahy were potential witnesses at trial. The State contended that it had a standing offer to let Giddings examine its file. *Bailey*, ¶ 14. Detective Ekola provided Giddings with a report in 2005 that detailed the nature of Gillette's testimony. Giddings had more than a month to prepare his cross-examination of Gillette after the State gave formal notice. Giddings's detailed cross-examination of Gillette regarding his past crimes further belies his claim that he did not have sufficient time to impeach effectively.

¶72 Though the State initially did not endorse Mulcahy as a witness, it did provide Giddings with a report that detailed the information provided by Mulcahy. The State provided Giddings with an NCIC report on Mulcahy on November 29, 2006. Giddings's July 7, 2006, motion to compel also indicates that Giddings knew that Mulcahy potentially would testify. Giddings's motion requested the State to provide the complete criminal history of "any witnesses the State intends to call at trial . . . in this matter, including but not limited to . . . Ryan Mulcahy."

22

¶73 Giddings further claims that Mulcahy's testimony about Giddings's attempt to implicate King in the murder suggested to the jury that Giddings had lied. This argument also falls short. Mulcahy recounted Giddings's claim that King, rather than Giddings, had been involved in the murder. Giddings elected at that point not to impeach Mulcahy regarding Mulcahy's criminal history. Giddings instead elicited more testimony from Mulcahy regarding Giddings's claim that King had committed the murder. The testimony that Giddings elicited from Mulcahy shed a negative light on King, rather than on Giddings.

¶74 We cannot say based on the record that the District Court acted arbitrarily without employment of conscientious judgment when it endorsed Mulcahy and Gillette as witnesses. *McCormack*, ¶ 22. The record also does not indicate that the District Court's actions caused Giddings a substantial injustice. *McCormack*, ¶ 22. The District Court therefore did not abuse its discretion when it allowed the State to add Gillette and Mulcahy as witnesses. *McCormack*, ¶ 22.

¶75 *Did the District Court abuse its discretion when it denied Giddings's motion for a mistrial based on the State's alleged violation of the District Court's order in limine?*

¶76 The District Court's order in limine excluded "any testimony or other evidence concerning whether Rolfe disliked or was afraid of Giddings." Giddings alleges that the State violated the court's order three separate times. The first alleged violation occurred when the prosecutor elicited testimony from Detective Ekola that Rick Strobel (Strobel), an associate of Giddings, had told him that King "would have been afraid of Giddings." Giddings argued outside the presence of the jury that the prosecutor had violated his promise not to elicit testimony barred by the court's order. Giddings also stated that Ekola's

23

testimony violated the spirit of M. R. Evid. 404(b), which bars evidence of other crimes, wrongs, or acts to show conformity therewith.

¶77 Detective Ekola's statement about King being afraid of Giddings did not violate the District Court's order in limine or M. R. Evid. 404(b). The statement did not implicate "testimony or other evidence concerning whether *Rolfe* disliked or was afraid of Giddings." His testimony was not evidence of "other crimes, wrongs, or acts." M. R. Evid. 404(b); *State v. Clifford*, 2005 MT 219, ¶¶ 46-49, 328 Mont. 300, 121 P.3d 489.

¶78 Giddings claims that the State next violated the order when Candice, Amy's mother, testified that Giddings had called looking for Amy the morning of the murder. Candice testified that she had told Giddings that Amy was not there, and she had instructed him not to call again. The prosecutor responded: "Okay. I don't want you to say anything that Amy said, okay? Could you describe her physical demeanor?" Candice answered: "She was scared."

¶79 Giddings did not object contemporaneously to Candice's statement regarding Amy being scared. In chambers, Giddings stated that he did not object immediately to the statement because he did not want to call more attention to it. Giddings argues that the "tactical decision" not to object contemporaneously was permissible, "especially in light of not wanting to call more attention to the matter in front of the jury." Giddings relies on *United States v. Goodman*, 457 F.2d 68, 72 (9th Cir. 1972), in which the court approved the practice of requiring incorporation by reference of previous objections after oral delivery of jury instructions.

24

¶80 Giddings also objects to testimony from Richard King. King described going over to Chris Rolfe's house with Giddings. Amy and Mix were in the house at the time. King stated that Strobel and Giddings talked while King went to the house. The following exchange occurred between the prosecutor and King:

Q. So after you saw Strobel, you went into the house?

A. No, not – there was conversations before I went in.

Q. Okay. Was Giddings a party to that conversation?

A. Yes, he was out there.

Q. Okay. And tell us about that conversation.

A. Rick Strobel, as he was coming through, he said that he didn't want Giddings – that Mr. Giddings couldn't go in there.

Q. Okay.

A. Amy specifically said – Amy –

Giddings's counsel objected before King could finish his answer. Giddings moved for a mistrial. The District Court denied Giddings's motion for a mistrial after Giddings argued his motion in chambers.

¶81 The State contends that there was nothing prejudicial in King's partial response that "Amy specifically said." The State argues that what King's answer might have been absent Giddings's objection does not entitle Giddings to a mistrial. The State also argues that Giddings did not preserve properly his request for a mistrial based on Candice's testimony that "Amy was scared."

25

¶82 We need not resolve the issue of whether Giddings properly preserved his objection to Candice's and King's testimony. The disputed portions of Candice's and King's testimony, individually or collectively, did not deny Giddings "a fair and impartial trial." *State v. Weldele*, 2003 MT 117, ¶ 75, 313 Mont. 452, 69 P.3d 1162. A mistrial is appropriate where there is a reasonable possibility that inadmissible evidence might have contributed to the conviction. *State v. Partin*, 287 Mont. 12, 18, 951 P.2d 1002, 1005-06 (1997). To determine whether a prohibited statement contributed to a conviction we consider the strength of the evidence against the defendant, the prejudicial effect of the testimony, and whether a cautionary instruction could cure any prejudice. *State v. Scarborough*, 2000 MT 301, ¶ 81, 302 Mont. 350, 14 P.3d 1202.

¶83 Giddings contends that given the court's prior orders, the court's admonishments, and the testimony, "it does not take a genius to put two and two together to realize Amy did not want Giddings in the house because she was afraid of him." Giddings argues that King's partial answer that "Amy specifically said" is "as severe" as the violation that prompted this Court's decision that a mistrial was appropriate in *Partin*, 287 Mont. 12, 951 P.2d 1002. There the State charged the defendant with forgery. A detective who was an expert in handwriting analysis testified that he had used fingerprints from Partin's previous arrest as a handwriting sample. Partin moved for a mistrial on the basis that the testimony violated the court's motion in limine to exclude other crimes evidence. *Partin*, 287 Mont. at 14, 951 P.2d at 1003. We determined that the evidence against Partin was "far short of being very overwhelming." We noted that the detective's testimony was the only link between Partin and the forged check. *Partin*, 287 Mont. at 18-19, 951 P.2d at 1006-07.

26

¶84    The State offered overwhelming evidence linking Giddings to Amy's murder. *See* ¶¶ 11-39; *Partin*, 287 Mont. at 19, 951 P.2d at 1006; *Scarborough*, ¶ 81. The disputed testimony itself also is less prejudicial than in *Partin*. The statement that "Amy was scared" does not constitute the type of direct other crimes evidence that "inevitably involves prejudice to the defendant." *Partin*, 287 Mont. at 19, 951 P.2d at 1006; *see also* M. R. Evid. 404(b). Giddings also objected before King could tell the jury what "Amy specifically said." The disputed portions of Candice's and King's testimony constituted small parts of a complex three-week trial. The testimony did not individually or collectively deny Giddings a fair trial. *Weldele*, ¶ 75. The District Court did not abuse its discretion in denying Giddings's motion for a mistrial. *Duncan*, ¶ 37.

¶85    *Did the District Court abuse its discretion when it limited Giddings's cross-examination of Richard Alan King?*

¶86    Giddings argues that the District Court's restrictions on his cross-examination of King violated his due process and Sixth Amendment right to present a complete defense. The District Court allowed Giddings to cross-examine King regarding his drug activity during the week of July 18, 2005, and his drug arrest in September of 2005, statements King made about being angry with Mike Mix and descriptions of how King intended to harm Mix, and King's 1998 deceptive practices conviction. The District Court also allowed Giddings to admit this evidence through other witnesses.

¶87    The District Court denied Giddings's request to submit evidence that: 1) King burglarized three homes in 1996, 2) King had been convicted of Aggravated Assault in 1996 for pointing a gun at someone and threatening him, 3) King had been convicted of a second

27

assault, 4) King allegedly had broken Saunders's nose in December of 2005 and pled guilty to Partner or Family member assault, 5) King allegedly had beaten up Buffy Miller, 6) King allegedly was known to carry an ax handle and a tire iron, 7) King "didn't like women," and 8) King allegedly had threatened that other women would end up like Amy if they did not comply with his wishes. Giddings sought to admit this evidence about King's crimes and other alleged acts in order to show that King had killed Amy.

¶88 A defendant may introduce "reverse 404(b) evidence" to inculpate another person, thus exculpating himself. *Clifford*, ¶ 44; M. R. Evid. 404(b). A defendant seeking to offer evidence of prior bad acts "must clearly articulate how that evidence fits into a chain of logical inferences." *Clifford*, ¶ 48. No link of this chain of logical inferences may be the inference "that the defendant has the propensity to commit the crime charged." *Clifford*, ¶ 48. The defendant may not introduce reverse 404(b) evidence where it lacks connection with the crime, is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial. *Holmes v. South Carolina*, 547 U.S. 319, 327, 126 S. Ct. 1727, 1733 (2006).

¶89 Giddings argued that "anything having to do with King being a violent man is highly relevant." Much of the evidence that Giddings wanted to introduce in order to inculpate King, however, clearly qualified as inadmissible propensity evidence. Giddings contends that King had committed other acts of violence, so he likely acted in conformity by killing Amy. King had burglarized homes in 1996, so he likely acted in conformity by breaking into Amy's home in 2005. King did not like women, so he likely acted in conformity by killing

Amy. King was known to carry around an ax handle, so he likely acted in conformity by killing Amy with a blunt object.

¶90    Giddings's arguments to the District Court contradict his assertion that he was "not trying to paint a picture King was a bad guy, and from that picture have the jury believe he killed Amy." Giddings argued that the court should admit the evidence because "this jury is going to be more inclined to think that Richard Alan King killed Amy Rolfe if they hear he's a violent man when he doesn't get from a woman what he wants, that he proceeds to beat it out of her." Evidence offered for Giddings's stated purpose directly would violate M. R. Evid. 404(b)'s prohibition on evidence of character offered to show conformity therewith. *Clifford*, ¶ 48.

¶91    The validity of much of Giddings's "evidence" also was suspect. Giddings failed to "create a chain of logical inferences" between the evidence and Amy's murder, despite numerous opportunities to present evidence showing specific connective facts. *Clifford*, ¶ 48; *Holmes*, 547 U.S. at 327, 126 S. Ct. at 1733. Giddings attempts to create this chain of logical inferences on appeal using evidence not presented at trial. Giddings claims that he also argued that he should have been allowed to show that King had threatened Amy, that King had been removed from Amy's house, and that the locks on Amy's house had been changed because of King. The State appears to be correct in its assertion that Giddings actually committed these acts, not King. The State on August 4, 2006, moved to introduce this exact evidence about Giddings in its response to Giddings's motion in limine to exclude "Just" Evidence.

¶92 Giddings also argues that the District Court should have permitted cross-examination of King on these matters under M. R. Evid. 404(c) and 405(b). These rules allow proof of specific instances of conduct in cases in which character or a trait of character constitutes an essential element of a charge, claim, or defense. Giddings argued to the District Court that evidence of King's violent nature "certainly is an essential element of our case that he's – that he is a violent person. And that he attacks women when he is – when he is angry and upset." This argument represents another attempt to introduce impermissible propensity evidence. Giddings's defense was that King killed Amy. A potentially violent nature does not constitute an essential element to homicide. *See* § 45-2-102(1)(a), MCA.

¶93 Giddings posits a number of other theories for why the District Court should have allowed him greater latitude in cross-examining King. Each theory represents an attempt to admit propensity evidence under a different guise. Despite numerous requests from the District Court to make offers of proof, Giddings failed to show that the evidence was not propensity evidence, that the evidence was not speculative, and that the evidence was not remote from the crime. *Holmes*, 547 U.S. at 327, 126 S. Ct. at 1733. Giddings also failed to create a chain of logical inferences tending to prove or disprove a material fact. *Clifford*, ¶ 48. The District Court thoroughly analyzed Giddings's request to cross-examine King about prior acts that allegedly pointed to King killing Amy. The District Court did not abuse its discretion when it limited Giddings's cross-examination of King. *Duncan*, ¶ 37.

¶94 *Did the District Court prejudice Giddings by allowing a videotape of a police interview with Giddings into the jury room during deliberations?*

30

¶95 The police conducted two interviews of Giddings the day after the murder. The District Court admitted into evidence an edited videotape of the interviews. The jury watched the videotape aided by a corresponding transcript during the State's case. The court advised the jury that they would not have the transcript in the jury room. Giddings did not object to the playing of the videotape, but argued that it should not go to the jury room. The District Court determined that the videotape was not testimonial in nature and simply constituted Giddings's voluntary statement the day after the homicide.

¶96 Giddings argues that the District Court violated his due process rights by allowing the videotape into the jury room. Giddings claims that the jury's possible review of the videotape during deliberations unduly emphasized his demeanor and his statements to the exclusion of other witness testimony. Section 46-16-504, MCA, provides that juries may take into deliberations any exhibit admitted into evidence "that in the opinion of the court will be necessary." We highlighted in *State v. Bales*, 1999 MT 334, ¶ 23, 297 Mont. 402, 994 P.2d 17, the risk of undue emphasis if the district court sends testimonial materials into the jury room during deliberations.

¶97 We need not resolve the issue of whether the Giddings videotape is testimonial in nature. The District Court's action did not prejudice Giddings. Giddings has not claimed, and the record does not show, that his statements and demeanor on the tape conflict with testimony given by other witnesses at trial. *Bales*, ¶¶ 25, 29. Giddings also has not claimed that the tape was critical to the State's case. *Bales*, ¶ 25. The tape has limited evidentiary value due to its poor visual and audio quality. We agree with the State that any evidentiary

31

value that the jury may have derived from the videotape came from watching the videotape with the aid of a transcript during the trial.

¶98     The District Court's ruling that allowed the videotape to accompany the jury during deliberations did not emphasize unduly the Giddings interview to the exclusion of other witnesses. *Bales*, ¶ 25. In light of the totality of the circumstances, we conclude that the videotape was at worst cumulative of other evidence, and that it did not prejudice Giddings. *Bales*, ¶¶ 29-30.

¶99     *Does the doctrine of cumulative error warrant reversal of Giddings's conviction?*

¶100    Giddings argues that numerous errors during the course of the trial warrant reversal under the cumulative error doctrine. The cumulative error doctrine requires reversal of a conviction where a number of errors, taken together, have prejudiced a defendant's right to a fair trial. *State v. Ferguson*, 2005 MT 343, ¶ 126, 330 Mont. 103, 126 P.3d 463. The defendant must establish the existence of prejudice. Mere allegations of error without proof of prejudice are inadequate to satisfy the doctrine. *Ferguson*, ¶ 126. We decline to apply the cumulative error doctrine to Giddings's claims. We separately considered each of Giddings's claims above and determined that he was not prejudiced.

¶101    *Did the District Court illegally sentence Giddings to life without the possibility of parole?*

¶102    The jury convicted Giddings of deliberate homicide in violation of § 45-5-102(1)(a), MCA. A sentencing court may sentence a person convicted of homicide to death, life

32

imprisonment, or imprisonment for a term of 10 to 100 years. Section 45-5-102(2), MCA. Whenever the sentencing court imposes imprisonment for a term exceeding one year, the court also may impose a parole eligibility restriction. Section 46-18-202(2), MCA. The District Court sentenced Giddings to life without parole.

¶103 Giddings argues that the District Court's parole eligibility restriction constitutes a sentence enhancement that requires a unanimous jury pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000). We rejected a similar claim in *State v. Garrymore*, 2006 MT 245, 334 Mont. 1, 145 P.3d 946. We concluded that "the statutory maximum punishment for the crime of deliberate homicide when the death penalty is not sought, for the purposes of *Apprendi*, is life imprisonment without the possibility of parole." *Garrymore*, ¶ 32; *see also Rosling*, ¶¶ 64-65 (affirming *Garrymore*). The State did not seek the death penalty for Giddings. Life imprisonment without the possibility of parole falls within the range of punishments authorized by a jury's guilty verdict on a deliberate homicide charge under § 45-5-102(1), MCA. *Garrymore*, ¶ 32; *Rosling*, ¶¶ 64-65. The District Court's sentence of life without the possibility of parole did not constitute an enhancement of the maximum punishment authorized by the jury's verdict of guilty on the deliberate homicide charge. *Garrymore*, ¶ 32; *Rosling*, ¶¶ 64-65.

¶104 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ JOHN WARNER

33

/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON