

DA 08-0267

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 34

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

TERENCE RICHARDSON PASSMORE,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Sixth Judicial District,
In and For the County of Park, Cause No. DC-2006-060
Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wendy Holton, Attorney at Law, Helena, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General, Sheri K. Sprigg,
Assistant Attorney General, Helena, Montana

          Carlo Canty, Special Deputy Park County Attorney, Helena, Montana

          Brett Linneweber, Park County Attorney, Livingston, Montana

                        Submitted on Briefs:  August 12, 2009

                                   Decided:  February 16, 2010

Filed:

             _____
                          Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Terence R. Passmore appeals from his convictions of one count of sexual intercourse without consent and three counts of sexual assault following a jury trial in the Sixth Judicial District Court, Park County.  We affirm.

## ISSUES

¶2     Passmore raises four issues on appeal:

1. Did the District Court err in denying Passmore's motion to dismiss the prosecution on the grounds of preaccusation delay?

2. Did the District Court err in denying Passmore's motion to dismiss the prosecution on the grounds of prosecutorial misconduct?

3. Did the District Court abuse its discretion in disallowing extrinsic evidence of prior statements allegedly made by one of the victims?

4. Did the District Court abuse its discretion in excluding testimony from a defense witness that Passmore lacked the character traits of a sex offender?

## BACKGROUND

¶3     Passmore and his wife moved to Livingston, Montana, in March 1997 after he was offered the pastorship of the Livingston Church of God.  The two victims in the present case, whom we refer to as C.R. and J.R., and their parents, Edwin and D'Dea, joined Passmore's congregation the following year.  At the time, C.R. was 11 years old (she turned 12 in July 1998) and J.R. was 13 years old (she turned 14 in November 1998).

¶4     The events underlying the charged offenses occurred in the summer and fall of 1998.  During this period, C.R. routinely helped out at the church with various chores,

2

such as cleaning, vacuuming, painting, spraying weeds, and picking up rocks in the yard. J.R. also helped out with chores, though not as often. On occasions when they were both at the church, C.R. and J.R. typically worked separately on different projects.

¶5 C.R. and J.R. both testified at Passmore's trial about interactions and contacts he had with them of a sexual nature. For example, J.R. testified that one day while she was taking laundry up to Passmore's bedroom in the parsonage, Passmore followed her there and asked whether she had started her menstrual cycle yet, whether she was having sex with boys, and whether she had been tickled all over. Passmore lay down on the bed and asked J.R. to lie beside him so he could tickle her. J.R. felt this would be inappropriate; so, she made up an excuse and left the room.

¶6 Similarly, C.R. testified that one day while she was vacuuming the sanctuary, Passmore came in and asked her to sit down because he wanted to ask her a question. She did so, and Passmore then asked whether she had started her menstrual cycle. C.R. replied, "No." He also asked whether J.R. had started her menstrual cycle, and C.R. said she did not know. Passmore then pulled C.R. closer and started tickling her. C.R. squirmed, and they ended up on the floor, at which point Passmore put C.R.'s hands over her head and held them there with one hand while he tickled her with his other hand. He then moved his hand up her leg, under her shorts, and started rubbing her genitalia. He commented that her underwear was his favorite color. He then moved the underwear aside and digitally penetrated her vagina. C.R. testified that "I was trying to fight him, and eventually I just kind of calmed down and said, I think I need to go back to vacuuming, now. And he got up and went back into his office."

3

¶7     Shortly thereafter, C.R. was in the nursery picking up toys and preparing to vacuum when Passmore came in and started tickling her again. She testified that "we wound up, again, on the floor where we kind of . . . wrestled back and forth. I remember him being on top of me, and then somehow in our moving around, it got to where we were facing each other, but I was positioned more on his lap, and he was holding me there." At this point, Edna Miller (a member of the congregation) entered the room. She saw Passmore and C.R. sitting on the floor facing each other. Passmore had his legs straight out and C.R. was straddling his knees. Miller further observed that Passmore was holding C.R.'s arms and rocking her back and forth. After roughly 30 seconds, they noticed Miller standing there. According to Miller, C.R. jumped up and stated, "He's teasing me." Passmore, who was "kind of red-faced," also jumped up and left the nursery, telling Miller he needed to show her a document in his office.

¶8     C.R. testified about several other incidents. One took place in a shed Passmore was building near the parsonage. C.R. was working on a project there when Passmore started tickling her and his hand went up her shirt to her chest. In another instance, also in the shed, Passmore fondled C.R.'s breasts and tried to do the same with her genitalia. Regarding this tickling and fondling, C.R. explained that she "thought it was kind of a weird situation, but he was the pastor, so I didn't question it."

¶9     Another incident occurred in Passmore's truck while he and C.R. were going to get some dirt to fill in holes in the parsonage yard. Passmore placed one hand on C.R.'s thigh while he was driving and rubbed her inner thigh near her crotch. On still another occasion, C.R. accidentally got paint on her shorts while painting some trim on the shed.

4

Passmore suggested it would be a good idea to wash them right away to get the paint out. So, they put the shorts in the laundry machine and C.R., in the meantime, wore a pair of windbreaker pants she had with her. Later, while waiting for the shorts to dry, C.R. and Passmore sat on a couch in the parsonage and watched some home videos. At some point, Passmore asked C.R. to sit on his lap. She complied, but sat perpendicularly to his legs. Passmore, however, turned her so that she was facing him, with her buttocks on his knees. C.R. testified that the following then occurred:

> We sat there for a minute, and he had his hands on my stomach and abdomen, where he lifted my shirt up. He commented on the fact that my bra was more fancy and lacey. He continued up, and one hand went over the top of my bra, with the lace, and the other one went underneath, 'cause it was stretchy, and he, I guess you would call it manipulated my breasts.

C.R. stated that Passmore fondled her breasts for about five minutes until C.R. told him that she could see his wife coming down the road in their Subaru.

¶10 In July 1998, the church youth group took a trip to the Big Timber Waterslide Park. Passmore and several parents chaperoned the event. J.R. testified that Passmore went down the slides with her and, with J.R. sitting in front of him, "he would grab me over my chest and lay me back against him to go through the tunnels," with his inner forearms on J.R.'s breasts. J.R. felt uncomfortable with this but assumed it was accidental because "I didn't think that my pastor would purposefully touch me like that." C.R. testified that Passmore rode down the slide with her as well and that as they leaned back to go through the tunnels, his hands moved from her waist up to her breasts.

¶11 The youth group also took a trip to Chico Hot Springs in December 1998. C.R. testified that Passmore was in the pool with her and the other kids and that he attempted

to put his hand inside her swimsuit. C.R. swam away and hid behind some male friends. J.R. testified that Passmore actually tickled her and, at one point, put one arm around her midsection and pinched her butt three times with his other hand. J.R. elbowed Passmore in the face and took a swing at him with her right hand in order to get away.

¶12 On the way home from Chico, Edwin asked J.R. why she had taken a swing at Passmore in the pool. J.R. told him it was because Passmore would not stop pinching her butt. The next morning, C.R. told D'Dea that Passmore had touched her inappropriately as well and that this had been going on since the summer. In light of these revelations, Edwin and D'Dea filed a complaint with church officials (on behalf of C.R. and J.R.) and attempted to resolve the matter within the confines of the church. As D'Dea explained at trial, "part of the doctrine was that we were to settle things within and not go to the outside. So, we tried. We did everything that we could feasibly do, through the church, itself, to rectify the situation." They did not report the incidents to law enforcement.

¶13 A church "Trial Board" reviewed Edwin and D'Dea's complaint and concluded in December 1998 that the evidence against Passmore was "inconclusive." Nevertheless, observing that "the appearance of 'borderline' conduct remains an issue," the board recommended that Passmore undergo counseling. Passmore, however, voluntarily left his position and moved out of state in January 1999.

¶14 Although Edwin felt that the matter had not been dealt with appropriately, he also felt that it was out of his hands. Then, in 2002, he did some plumbing work for a local attorney named Mark Hartwig. Upon learning that Hartwig was an attorney, Edwin described the incidents involving Passmore and the decision of the church board, and he

conveyed some confusion about his and his daughters' rights. Hartwig advised Edwin to report the incidents. Thereafter, in the fall of 2002, Edwin contacted the County Attorney and also met with Michelle Morris, a detective with the Livingston Police Department.

¶15 The State did not initially pursue the matter, however. Conflicting explanations for this were provided at trial. Morris stated that she did not open an investigation "because I didn't have victims' testimony, statements, interviews." She testified that C.R. and J.R. "were not cooperative, at that time." J.R., in contrast, testified that she was with Edwin when he went to see Morris and that she told Morris during this meeting what had happened with Passmore. J.R. and Edwin both stated they were under the impression that Morris did not pursue the matter because too much time had passed since the incidents (i.e., the case had become stale). Morris, however, denied having said that it was too late to prosecute. Rather, she testified that she had told Edwin she needed victim statements due to the lack of physical evidence and eyewitnesses. Morris also stated that the only contact she had was with Edwin on that one date and that she had advised him he needed to convince his daughters to come in and speak with her. Yet, according to Morris, Edwin "made it clear that they were uncooperative, at the time." Morris said that to the best of her recollection, she never spoke with J.R.

¶16 Edwin eventually retained Hartwig, who in April 2005 filed a civil suit against Passmore and the Church of God on behalf of C.R. and J.R. Ultimately, the civil claims against the church were settled in late 2006 for an undisclosed sum and, in conjunction with the settlement, the civil claims against Passmore were dismissed. In the meantime, Hartwig (at the behest of his clients) also made efforts to have criminal charges brought.

7

Specifically, shortly after filing the civil complaint, Hartwig gave a copy of it to the Park County Attorney (Tara DePuy at the time) and suggested that she take a look at it since the conduct alleged in the complaint could merit a criminal investigation. Following a change of personnel in the Park County Attorney's Office, Hartwig gave a copy of the civil complaint to the new County Attorney (Brett Linneweber) in September or October of 2005. Linneweber indicated that he would look into the matter.

¶17 On November 14, 2005, Linneweber referred the case to Park County Detective Tony Steffins, who in turn proceeded with an investigation. Thereafter, Linneweber filed a criminal complaint against Passmore in Park County Justice Court on April 10, 2006. The court issued an arrest warrant, which was served on Passmore in Virginia (where he was living at the time) on April 11. Linneweber then filed an information in District Court on May 31, 2006, alleging multiple counts of sexual assault and sexual intercourse without consent. In July 2007, the court granted a motion by the State to file an amended information, charging six counts of sexual assault, a felony, in violation of § 45-5-502, MCA (1997), and two counts of sexual intercourse without consent, a felony, in violation of § 45-5-503, MCA (1997). The charges were as follows:

Count I (sexual assault): repeatedly touching C.R.'s breasts and/or genitalia during the period of May 1, 1998, through December 9, 1998.

Count II (sexual intercourse without consent): digitally penetrating C.R.'s vulva on or about July 1, 1998.

Count III (sexual assault): touching C.R.'s breasts at the Big Timber Waterslide Park on or about July 15, 1998.

Count IV (sexual assault): touching J.R.'s breasts at the Big Timber Waterslide Park on or about July 15, 1998.

8

Count V (sexual assault): grabbing or touching J.R.'s buttocks in a pool at Chico Hot Springs on or about December 10, 1998.

Counts VI, VII, and VIII: offenses involving another girl named A.M.[1]

¶18 Meanwhile, Passmore filed two pretrial motions relating to Detective Steffins' investigative tactics. First, he moved to suppress statements he had made during an April 2006 interview with Steffins in Virginia. The District Court granted the motion, finding that under the totality of the circumstances, "Detective Steffins crossed the boundary into coerciveness." The court also found that Steffins' "guilt assumption technique" was "not only coercive but unconscionable." Second, Passmore moved to dismiss the entire case on the grounds of "outrageous governmental conduct." He asserted that Steffins had attempted to influence three witnesses' testimony and to deter them from testifying on behalf of the defense. He further asserted that Steffins had obtained exculpatory evidence in the course of his interviews but had failed to disclose this evidence to the defense. The District Court held an evidentiary hearing at which Passmore's claims were largely substantiated. For example, one of the witnesses testified that Steffins had told her: "I've done my job for many years, I know what a pedophile is, . . . [and] Terry is a prime candidate for a pedophile." Similarly, another witness testified that Steffins had told him: "[W]ithin the course of the years that I've been doing this sort of thing, I can tell you that he is guilty." The District Court found that Steffins had in fact "attempted to influence witnesses" and that Steffins' conduct was "outrageous and unacceptable"—a finding that the prosecuting attorney effectively conceded at the conclusion of the hearing. The court

---

[1] The jury ultimately acquitted Passmore of all charges involving A.M.

also found that Steffins had obtained "exonerating information" during the interviews. However, the court noted that since the three witnesses had been listed as defense witnesses, Passmore could have interviewed them and obtained the exonerating information himself. Furthermore, the court observed that each of the witnesses had testified that Steffins did not actually succeed in influencing their testimony. Thus, the court denied Passmore's motion to dismiss because he had failed to show prejudice. But the court told him that he would have great latitude in questioning these witnesses about Steffins' behavior and credibility. The court also indicated that it would sanction Steffins in a separate proceeding.

¶19 A seven-day jury trial commenced on November 26, 2007. Twenty witnesses testified, including Passmore. He denied molesting C.R. in the shed, denied pinning C.R. down and putting his fingers in her vagina, denied asking J.R. to lie down on a bed with him, and denied asking C.R. or J.R. whether they had started their menstrual cycles. He admitted to having tickled C.R., but he claimed that he did not intend it to be sexual. Rather, he stated that C.R. used to jump on his back and that he would tickle her in order to dislodge her. He testified that he had no recollection of how C.R. ended up on his lap in the nursery the day Edna Miller observed them; however, he conceded that it "looked very bad" for him, a forty-year-old man, to be sitting on the floor of the nursery holding C.R.'s arms and rocking her back and forth while she was straddling his legs, with her legs spread apart, wearing shorts. Passmore also admitted to riding down the waterslides with some of the kids in the youth group, but he said he never touched C.R.'s or J.R.'s breasts during those rides. In addition, he admitted to engaging in "horseplay" with 12 of

10

the kids in the pool at Chico Hot Springs, but he did not remember making any physical contact with C.R. He also did not recall J.R. elbowing him or taking a swing at him, and he denied touching or pinching J.R.'s butt.

¶20 The jury ultimately acquitted Passmore of Count III (touching C.R.'s breasts at the Big Timber waterslides) and Counts VI, VII, and VIII (the offenses involving A.M.). But the jury returned guilty verdicts on Counts I, II, IV, and V. The court designated Passmore a Level 1 sex offender, *see* § 46-23-509, MCA, and sentenced him to 35 years in the Montana State Prison, with 5 years suspended, for sexual intercourse without consent. The court further sentenced him to 10 years in prison, with 5 years suspended, on each of the three sexual-assault convictions. These sentences are to run concurrently.

¶21 Additional facts are set forth below where relevant.

## DISCUSSION

¶22 ***Issue 1. Did the District Court err in denying Passmore's motion to dismiss the prosecution on the grounds of preaccusation delay?***

### I. Standard of Review

¶23 The issue of preaccusation[2] delay presents a question of constitutional law. *See State v. DuBray*, 2003 MT 255, ¶ 28, 317 Mont. 377, 77 P.3d 247; *State v. Taylor*, 1998 MT 121, ¶ 18, 289 Mont. 63, 960 P.2d 773. We review a trial court's resolution of such questions de novo to determine whether the court's interpretation and application of the

---

[2] Although some of our cases use the term "preindictment," we use the term "preaccusation" here. For one thing, the prosecution against Passmore was commenced by a complaint, not an indictment. Moreover, the term "preaccusation" better reflects the fact that there are several methods of commencing a prosecution, *see* § 46-11-101, MCA, and the fact that the right at issue here applies to the period before official accusation. (The speedy trial right applies postaccusation.)

11

law are correct. *See Taylor*, ¶ 19; *State v. Ariegwe*, 2007 MT 204, ¶ 119, 338 Mont. 442, 167 P.3d 815; *State v. Spang*, 2007 MT 54, ¶ 7, 336 Mont. 184, 153 P.3d 646.

## II. Passmore's Motion to Dismiss for Preaccusation Delay

¶24 On November 21, 2007, Passmore filed a motion to dismiss the case due to "excessive pre-indictment delay." He asserted that he had suffered "extreme" prejudice because the State's investigation of the charges was untimely and gave the complaining witnesses "years to hone their stories" and also gave A.M. the opportunity "to join in the accusations." He asserted that he "would not have spent years building a successful career only to see it ruined" and that his family "would have had the matter resolved, one way or another, a long time ago, versus what happened: adding a fourth child to their family (in 2004) and thinking that they could move on with their lives, then facing ruin." The District Court denied the motion on two grounds. First, the court viewed the motion as "outside of the scheduling order" and, thus, untimely. Second, the court observed that Passmore had argued only personal consequences resulting from the delay and had not shown prejudice in his ability to present a defense at trial.

## III. Applicable Law

¶25 The Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee a criminal defendant the right to a speedy trial. This right applies once a defendant has been indicted, arrested, or otherwise officially accused. *See Ariegwe*, ¶¶ 20, 42. It does not apply, however, to the period between crime and official accusation. *See Ariegwe*, ¶ 42; *United States v. MacDonald*, 456 U.S. 1, 6-7, 102 S. Ct. 1497, 1501 (1982); *United States v. Marion*, 404

12

U.S. 307, 313-15, 320-21, 92 S. Ct. 455, 459-60, 463-64 (1971). Rather, the law has provided other mechanisms to guard against long delay during the preaccusation period.

¶26 One mechanism is the applicable statute of limitations. Indeed, this is the primary guarantee against bringing overly stale criminal charges. *Marion*, 404 U.S. at 322, 92 S. Ct. at 464; *accord State v. Krinitt*, 251 Mont. 28, 32-33, 823 P.2d 848, 851 (1991).

> The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity.

*Toussie v. United States*, 397 U.S. 112, 114-15, 90 S. Ct. 858, 860 (1970). Statutes of limitations thus represent legislative assessments of relative interests of the state and the defendant in administering and receiving justice. *Marion*, 404 U.S. at 322, 92 S. Ct. at 464. They are made for the repose of society and the protection of those who may, during the preaccusation period, have lost their means of defense. *Id.* They provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.[3] *Id.*

¶27 The applicable statute of limitations, however, does not fully define a defendant's rights with respect to the events occurring prior to official accusation. *Id.* at 324, 92 S. Ct. at 465. The Supreme Court has recognized that "the Due Process Clause has a

---

[3] In the present case, there is no dispute that the prosecution was commenced within the statute of limitations. *See* § 45-1-205(1)(b), MCA (1997) (5 years after the victim reaches the age of 18; J.R. reached 18 in 2002, and C.R. reached 18 in 2004).

limited role to play in protecting against oppressive [preaccusation] delay." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S. Ct. 2044, 2048 (1977). Specifically, the Due Process Clause requires dismissal of the prosecution where compelling the defendant to stand trial (even though the statute of limitations has not yet run) would violate "those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." *Id.* at 790, 97 S. Ct. at 2049 (citation and internal quotation marks omitted). To determine whether such a violation has occurred, "the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.* And, unlike the right to a speedy trial, where no one factor in the analysis is either a necessary or a sufficient condition to the finding of a deprivation of the right, *see Ariegwe*, ¶¶ 101-102, "proof of prejudice is generally a necessary but not sufficient element of a due process claim," *Lovasco*, 431 U.S. at 790, 97 S. Ct. at 2048-49.

¶28 Accordingly, in making a due process claim based on preaccusation delay, the defendant first must demonstrate that he or she has suffered actual, substantial prejudice resulting from the delay. *Krinitt*, 251 Mont. at 34, 823 P.2d at 852 (citing *United States v. Valentine*, 783 F.2d 1413, 1416-17 (9th Cir. 1986)). Prejudice in this context means "that sort of deprivation that impairs a defendant's right to a fair trial." *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999). Such prejudice is commonly demonstrated by the loss of witnesses or physical evidence or the impairment of their use (e.g., dimming of a witness's memory). *See United States v. Mays*, 549 F.2d 670, 677 (9th Cir. 1977); *Cornielle*, 171 F.3d at 752; *see also e.g. State v. Taylor*, 1998 MT 121, ¶¶ 22-27,

289 Mont. 63, 960 P.2d 773. It could also be demonstrated by the defendant's inability to assist in his own defense. *See United States v. Schaffer*, 586 F.3d 414, 424-25 (6th Cir. 2009). But the defendant has a "heavy burden" to show that preaccusation delay caused actual prejudice. *United States v. Moran*, 759 F.2d 777, 782 (9th Cir. 1985). The proof must be definite and not speculative or presumed. *See id.*; *Schaffer*, 586 F.3d at 425; *see also United States v. Manning*, 56 F.3d 1188, 1194 (9th Cir. 1995) ("Generalized assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual prejudice."). And the defendant must demonstrate not only the loss of a witness or evidence, but also how that loss is prejudicial to his case, *Moran*, 759 F.2d at 782; *Mays*, 549 F.2d at 677, i.e., how the loss "actually impaired his ability meaningfully to defend himself," *United States v. Pallan*, 571 F.2d 497, 501 (9th Cir. 1978); *accord United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007). *See also United States v. Canoy*, 38 F.3d 893, 902 (7th Cir. 1994) (the defendant must present concrete evidence showing material harm).[4]

---

[4] Citing *City of Billings v. Bruce*, 1998 MT 186, 290 Mont. 148, 965 P.2d 866, Passmore contends that "there comes a point when the delay is presumptively prejudicial and the burden shifts to the prosecution to rebut the presumption." *Bruce*, however, has been overruled on this point, *see State v. Ariegwe*, 2007 MT 204, ¶¶ 56-58, 338 Mont. 442, 167 P.3d 815, and there is no such burden-shifting rule applicable to preaccusation delay claims in any event. Passmore also cites ¶ 37 of *Bruce* for the proposition that " 'excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or for that matter identify.' " This statement, however, concerns speedy trial analysis; and preaccusation delay is tested by general proscriptions of due process, not the "more stringent requirements" of the speedy trial right. *See United States v. Sandoval*, 990 F.2d 481, 485 n. 8 (9th Cir. 1993). In this regard, it should be noted that unlike the protection against oppressive preaccusation delay, the protection against oppressive postaccusation delay is specifically affirmed in the Constitution. *See Barker v. Wingo*, 407 U.S. 514, 533, 92 S. Ct. 2182, 2193 (1972). Moreover, the Speedy Trial

¶29 If the defendant makes a showing of actual, substantial prejudice from the delay, then the State must come forward and provide its reasons for the delay, *Canoy*, 38 F.3d at 902, and the court must then weigh the State's justification for the delay against the defendant's prejudice and the absolute length of the delay to determine if due process would be (or has been) denied by compelling the defendant to stand trial, *see id.*; *Krinitt*, 251 Mont. at 34-35, 823 P.2d at 852 (citing *Lovasco*, 431 U.S. at 790, 97 S. Ct. at 2048-49, *Mays*, 549 F.2d at 677-78, and *Moran*, 759 F.2d at 780-83); *Taylor*, ¶ 20. "The greater the length of the delay and the more substantial the actual prejudice to the defendant becomes, the greater the reasonableness and the necessity for the delay will have to be to balance out the prejudice." *Mays*, 549 F.2d at 678. But despite the degree of actual prejudice, there must be some culpability on the government's part before a dismissal may be granted. *Id.* For example, although the government has a good deal of leeway in its decisions as to the timing of arrests and filing charges, *see id.*; *Lovasco*, 431 U.S. at 790-96, 97 S. Ct. at 2049-52, dismissal would be required if the State delayed the prosecution intentionally in order to gain a tactical advantage over the defendant and the defendant suffered substantial prejudice as a result, *see Marion*, 404 U.S. at 324, 92 S. Ct. at 465. Likewise, delay is weighed heavily against the State if it was incurred in reckless disregard of circumstances indicating an appreciable risk that delay would impair the

Clause and the Due Process Clause balance different sets of interests in their respective arenas. *See Marion*, 404 U.S. at 320, 92 S. Ct. at 463; *Barker*, 407 U.S. at 519-22, 92 S. Ct. at 2186-88; *Lovasco*, 431 U.S. at 790-96, 97 S. Ct. at 2049-52. Thus, rules designed to implement the speedy trial right may not be appropriate for addressing preaccusation delays under the Due Process Clause. The presumption of prejudice applicable to speedy trial claims (*see Ariegwe*, ¶¶ 44-56, 99) is one such rule. *Schaffer*, 586 F.3d at 425.

defendant's ability to mount an effective defense. *See Lovasco*, 431 U.S. at 795 n. 17, 97 S. Ct. at 2051 n. 17. Finally, negligent conduct may be considered, though it is weighed less heavily than deliberate delays. *Mays*, 549 F.2d at 678; *cf. State v. DuBray*, 2003 MT 255, ¶ 30, 317 Mont. 377, 77 P.3d 247 (the State must explain how periods of inactivity comport with a conscientious and reasonable investigation). "If mere negligent conduct by the prosecutors is asserted, then obviously the delay and/or prejudice suffered by the defendant will have to be greater than that in cases where recklessness or intentional governmental conduct is alleged."[5] *Moran*, 759 F.2d at 782.

## IV. Analysis

¶30 At the outset, the State argues that we should affirm the denial of Passmore's motion to dismiss on the ground that it was untimely. As noted, Passmore was charged in Justice Court on April 10, 2006; he was arrested the following day; the State filed the Information in District Court on May 31, 2006; and Passmore filed his motion to dismiss for preaccusation delay on November 21, 2007. The State argues that a claim based on preaccusation delay "ripens once the defendant has been formally accused, and therefore

---

[5] This Court has applied the foregoing two-prong test in a number of cases. *See e.g. Krinitt*, 251 Mont. at 34-36, 823 P.2d at 852-53 (no violation); *State v. Flesch*, 254 Mont. 529, 532-35, 839 P.2d 1270, 1272-73 (1992) (no violation); *Taylor*, ¶¶ 20-34 (violation); *State v. Burt*, 2000 MT 115, ¶¶ 15-16, 299 Mont. 412, 3 P.3d 597 (no violation); *State v. Wright*, 2000 MT 322, ¶¶ 23-33, 302 Mont. 527, 17 P.3d 982 (no violation); *DuBray*, ¶¶ 28-35 (no violation). As indicated by the numerous citations to federal cases in the text above, this test derives from federal interpretations of the federal Constitution. Although Passmore notes that the Montana Constitution has its own Due Process Clause (Article II, Section 17), which is a separate and enforceable constitutional right insofar as the jurisdiction of the State of Montana extends, *see State v. West*, 2008 MT 338, ¶ 27, 346 Mont. 244, 194 P.3d 683, he presents no argument that Article II, Section 17 requires a different analysis or a greater protection against preaccusation delay than under the Fourteenth Amendment.

can and should be raised 'at the time set by the court' " (quoting § 46-13-101(2), MCA).

But here, the State contends, Passmore missed the court's deadlines for filing pretrial motions and thus forfeited his right to raise this issue. The State relies on *State v. VonBergen*, 2003 MT 265, ¶ 13, 317 Mont. 445, 77 P.3d 537, where we observed that this Court "consistently has affirmed a district court's denial of an untimely motion to suppress under both current and predecessor statutes setting time requirements for such motions" (brackets and internal quotation marks omitted).

¶31 Yet, in the present case we are dealing with a motion to dismiss for preaccusation delay, not a motion to suppress, and we disagree with the State's premise that a claim of preaccusation delay always "ripens once the defendant has been formally accused." In some cases, actual prejudice to the defense resulting from such delay might not become evident until trial. Indeed, this point is implicit in *Marion*, where the Court observed that "*[e]vents of the trial* may demonstrate actual prejudice, but at the present time appellees' due process claims are speculative and premature." 404 U.S. at 326, 92 S. Ct. at 466 (emphasis added); *see also United States v. MacDonald*, 435 U.S. 850, 858, 98 S. Ct. 1547, 1552 (1978) ("Before trial, of course, an estimate of the degree to which delay has impaired an adequate defense tends to be speculative."); *United States v. Crouch*, 84 F.3d 1497, 1516 (5th Cir. 1996) (en banc). Notably, the *Marion* appellees filed their motion to dismiss just two weeks after they were indicted, *see Marion*, 404 U.S. at 308-09, 92 S. Ct. at 457, and yet the Supreme Court found those claims to be "speculative and premature." For these reasons, we reject the State's argument that a motion to dismiss for preaccusation delay cannot be raised after the deadlines set by the trial court for filing

other pretrial motions. While such a motion could indeed be untimely under the particular facts of a given case, *see e.g. United States v. Gladney*, 474 F.3d 1027, 1031 (8th Cir. 2007) (concluding that the defendant had failed to justify his waiting until just prior to closing arguments to raise the delay issue), we refuse to adopt the rigid rule advocated by the State here.

¶32 That said, we agree with the State as to the merits of Passmore's claim. He asserts that he suffered "extreme" prejudice due to the preaccusation delay, and he argues essentially four examples of this. We conclude, however, that he has not met his heavy burden of showing "actual, substantial prejudice" with definite, nonspeculative proof.

¶33 First, Passmore maintains that no charges would have been filed at all if "Hartwig had not filed a multi-million dollar civil suit and made multiple attempts to have a criminal prosecution instituted," ultimately "prevail[ing] with a prosecutor who assigned the case to an investigator who used unscrupulous techniques." This is all conjecture, however. There is no concrete evidence in the record that Linneweber would not have brought the charges but for the civil suit, Hartwig's efforts, and Steffins' "unscrupulous" techniques. For that matter, it seems that Passmore is complaining not about the delay in filing the charges, but about the fact that they were filed, allegedly at Hartwig's urging. Yet, Passmore has not explained how any of this demonstrates that he was prejudiced by the preaccusation delay. To the extent he is suggesting that the filing of charges is itself actual prejudice (a proposition for which he cites no authority), we disagree. If this implausible premise were accepted, every criminal defendant would satisfy the prejudice prong of the due process test simply by virtue of having been charged.

¶34     Second, Passmore asserts that he was prejudiced by the State's failure to pursue an investigation into C.R.'s and J.R.'s allegations until November 2005, three years after Edwin brought the matter to the attention of the County Attorney and Detective Morris. He says this delay gave C.R. and J.R. "years to embellish and hone their stories." In particular, he contends that once they had a "financial stake," C.R. and J.R. "embellished and honed their original stories to add allegations of skin to skin contact and digital penetration." In other words, he opines that the girls were motivated to fine-tune their stories and fabricate additional details in order to bolster their civil suit. Of course, even if this were true (arguendo), such a motivation could have arisen at any point during the preaccusation period, regardless of when the State opened its investigation. But more to the point, Passmore had ample opportunity at trial to cross-examine C.R. and J.R. on their stories, which he did vigorously, and he had the opportunity to argue to the jury that those stories should not be believed, which he also did vigorously.[6] He has not shown that his ability to present a defense was impaired by the alleged embellishment and honing.

¶35     Third, Passmore claims he was prejudiced by the loss of evidence—specifically, a computer. In an affidavit filed in conjunction with his motion to dismiss, he states:

> The complaining witnesses allege that they saw me looking at pornography on a computer in 1998. That computer was mine, and I used it at the church. It has long since been disposed of. If I had known these

---

[6] For example, Passmore argued repeatedly to the jury that the girls' stories were "made up." He also argued that C.R. and A.M. had discussed the specifics of their respective stories so as not to contradict each other at trial. "[T]hey just didn't want to step on each other's stories, and create problems for each other by [C.R.] testifying to things that [A.M.] might not testify to as having been the specifics of her story, and vice versa, [A.M.] didn't want to testify about specifics that [C.R.] told her in fear that it might complicate [C.R.'s] ability to make up things and not be impeached."

> charges were coming, I might have kept the computer to show there was no pornography on the hard drive. I cannot remember when or how I disposed of the computer.

The State contends that the District Court "cured any possible prejudice resulting from the loss of the computer" by excluding evidence of Passmore's alleged use of it to view pornography. Passmore maintains, however, that he was prejudiced because "[t]his case was about credibility—Passmore's versus that of the complaining witnesses." He argues that with the computer he could have shown (through the testimony of a forensic analyst) that their allegations about his having viewed pornography were untruthful. Again, however, Passmore is relying on supposition. He states in his affidavit that had he known the charges were coming, he "might" have kept the computer. Likewise, he asserts on appeal that "[i]f" he had retained the computer and had it analyzed, "he would have had powerful and persuasive evidence that the complaining witnesses lacked credibility." Yet, all he can do is speculate as to whether he actually would have used this evidence, which of course would have depended on how events played out at trial.

¶36 Finally, Passmore claims he suffered "severe anxiety and hardship" due to the preaccusation delay. He asserts that if the State's investigation had been more timely, he "would not have wasted years building a successful career only to see it ruined." Also, his family "would have had the matter resolved, one way or another, a long time ago, versus what happened: adding a fourth child to our family and thinking that we could move on with our lives, then finding ourselves destitute and myself unemployable." He contends that his anxiety and personal hardships figure into the analysis of whether he suffered prejudice. As an initial matter, we note that his anxiety does not appear to be the

21

result of the delay. While he claims he suffered anxiety during the preaccusation period, he also states that he and his family assumed they could move on with their lives, and in fact they added a fourth child to the family and he built a successful career. It appears, therefore, that his anxiety derives more from the fact that he ultimately was arrested than it does from the timing of the State's investigation.[7] But this point aside, anxiety suffered as a result of preaccusation delay may be a factor in the due process analysis; but without more, it does not constitute actual prejudice for purposes of establishing a due process violation. *See State v. Burt*, 2000 MT 115, ¶ 16, 299 Mont. 412, 3 P.3d 597; *cf. State v. Mouser*, 806 P.2d 330, 337 n. 3 (Alaska App. 1991) ("Because anxiety, no matter how real, will not, in itself, impair the accused in defending against a charge, it does not qualify as prejudice in the due process context."). Here, Passmore has not presented any concrete, nonspeculative evidence of actual prejudice or material harm, and he has not shown that the anxiety and personal hardships he says he suffered due to preaccusation delay actually impaired his ability meaningfully to defend himself.

¶37    In sum, Passmore has not demonstrated actual, substantial prejudice as a result of the preaccusation delay. Thus, he cannot prevail on his due process claim, and we need not consider the reasons for the delay. *See Krinitt*, 251 Mont. at 36, 823 P.2d at 853. We conclude that the delay in filing charges did not violate Passmore's right to due process, and we affirm the District Court's denial of his motion to dismiss.

---

[7] Indeed, in his affidavit Passmore states: "In 2001-03, I went to school to learn computer technology. I began to build a successful career, working as an independent contractor for the federal government, and my income eventually was $85,000 annually. All of that changed abruptly when I was arrested on April 11, 2006."

¶38     *Issue 2. Did the District Court err in denying Passmore's motion to dismiss the prosecution on the grounds of prosecutorial misconduct?*

### I.  Standard of Review

¶39     The denial of a motion to dismiss in a criminal case presents a question of law, which we review de novo.  *State v. Giddings*, 2009 MT 61, ¶ 42, 349 Mont. 347, 208 P.3d 363.  Underlying findings of fact, however, are reviewed under the clearly erroneous standard.  *State v. Lally*, 2008 MT 452, ¶ 13, 348 Mont. 59, 199 P.3d 818.  A finding is clearly erroneous if it is not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been made.  *Lally*, ¶ 13.

### II.  Passmore's Motion to Dismiss for Prosecutorial Misconduct

¶40     As noted, Hartwig gave Linneweber a copy of the civil complaint against Passmore and the church in September or October of 2005.  Linneweber told Hartwig that he would not commence a prosecution until law enforcement had completed an investigation.  Linneweber then referred the case to Detective Steffins in November 2005.  Thereafter, in April 2006, Linneweber filed a criminal complaint against Passmore in Justice Court and Passmore was arrested.  Linneweber then filed an information in District Court in May 2006.

¶41     Meanwhile, Linneweber and his wife filed a civil suit against C.R. in Park County Justice Court on December 13, 2005.  This suit arose out of a dispute between C.R. and Linneweber's stepdaughter, who had rented an apartment together earlier that year.  The

23

Linnewebers sought the return of a $375 rental deposit, and the Justice Court ultimately entered judgment in their favor on June 1, 2006.

¶42    Given his civil suit against C.R., Linneweber decided that he could not effectively prosecute the charges against Passmore. As he explained in a July 2007 deposition, "I never saw a legal or ethical conflict of interest that is defined by statute or under case law." Rather, "I know that in sexual assault cases it's very important, especially where there's minors or very young adults as victims, I know it's very important that those victims have a good relationship with the prosecutor and trust the prosecutor. Since [C.R.] and my family were in a negative relationship, that was going to be a problem." For this reason, after filing the charges against Passmore, Linneweber requested the prosecutorial services of the Montana Attorney General's Office. Assistant Attorney General Carlo Canty subsequently entered his appearance as a Special Deputy Park County Attorney on June 23, 2006, and represented the State through Passmore's trial.

¶43    Passmore filed a motion to dismiss the case as a matter of due process or pursuant to the District Court's "general supervisory authority." He suggested that Linneweber had been "influenced" to file the charges against Passmore "at the urging of private civil counsel, Mark Hartwig, prior to a full investigation into the matter." He further asserted that Linneweber's involvement in a civil suit against one of the alleged victims (C.R.) created a conflict of interest that precluded Linneweber from making the decision of whether to file charges against Passmore. In this regard, Passmore disputed Linneweber's distinction between a "legal" conflict and a "personal" conflict, arguing that "conflicts corrupt objectivity" regardless of their type. Relying on various rules and

24

standards of professional conduct and on the *Black's Law Dictionary* definition of "conflict of interest," he argued that where there is a real or seeming incompatibility between a prosecutor's private interests and his public duties, he "has no business taking *any* action charged on a case."

¶44 The District Court held two hearings and thereafter denied Passmore's motion. The court disagreed with Passmore's contention that a conflict of interest existed here:

> Defendant's assumption is that a negative relationship with a victim in an unrelated matter constitutes a conflict of interest in the filing of a charge against the Defendant. Because that criminal filing represents an effort to seek justice under law for that very victim, it is a stretch this Court finds impossible to make. If this was indeed such an exceptional conflict of interest, why did Mr. Linneweber file charges at all? The natural course of human behavior would be to respond to this alleged "negative" relationship by *not* filing any charges.

The District Court noted that it was persuaded by Linneweber's statement that he had sought assistance from the Attorney General's Office not because he had a legal conflict of interest, but because it was imperative that the victims be willing, open, and candid in their relation with the criminal prosecution.

### III. Arguments and Analysis

¶45 Passmore argues that the charges should have been dismissed due to prosecutorial misconduct. First, he asserts that the State's affidavit in support of the Information was based on an investigation (by Steffins) that "was not directed at finding the truth but on securing a conviction." He notes that Steffins used "illegal and outrageous" investigative techniques. Second, he claims that Linneweber "made the charging decision at the request of a civil attorney with a financial interest in the case and agreed to work with the

25

civil lawyers to secure a conviction." And third, Passmore contends that Linneweber made the charging decision knowing he had a conflict of interest and knowing he would have to step aside and obtain assistance from the Attorney General's Office. The basis of this supposed conflict (as explained by defense counsel's questioning at Linneweber's deposition) is as follows: Linneweber had filed suit to recover money *from* C.R., and Hartwig had filed suit (against Passmore and the church) to recover money *for* C.R.; therefore, Linneweber had an incentive to file criminal charges against Passmore in order to bolster C.R.'s civil suit against Passmore and the church and thereby increase his chances of getting paid by C.R. Passmore maintains that Linneweber violated certain standards of professional conduct by filing the charges in spite of this conflict. According to Passmore, "[a] charge brought by a prosecutor who knew he was conflicted cannot produce a result in which the community can have confidence." Consequently, he argues that "[d]ismissal under these circumstances would preserve fairness to the defendant, deter prosecutorial misconduct and protect judicial integrity." He cites *United States v. Carrasco*, 786 F.2d 1452, 1455 (9th Cir. 1986), and *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S. Ct. 2369 (1988), in support of this argument.

¶46 "Charging decisions are generally within the prosecutor's exclusive domain," and "the separation of powers [doctrine] mandates judicial respect for the prosecutor's independence." *Carrasco*, 786 F.2d at 1455; *see also State ex rel. Fletcher v. District Court*, 260 Mont. 410, 414-15, 417-18, 859 P.2d 992, 995, 996-97 (1993). Accordingly,

> an indictment will be dismissed only in flagrant cases of prosecutorial misconduct. Dismissal may be based either on constitutional grounds or on the court's exercise of its supervisory powers, and the appropriate analysis

26

will differ accordingly. The purpose of a dismissal may be to preserve fairness to the individual defendant, to deter prosecutorial misconduct, or to protect judicial integrity.

*Carrasco*, 786 F.2d at 1455 (citations omitted). But dismissal is permitted only if the misconduct was prejudicial to the defendant. *See* §§ 46-1-103(3), 46-20-701(2), MCA; *cf. Bank of Nova Scotia*, 487 U.S. at 254-55, 108 S. Ct. at 2373-74.

¶47 Here, Passmore has not demonstrated a flagrant case of prosecutorial misconduct. For one thing, his claim rests on dubious factual allegations which, for the most part, lack any support in the record. As noted, he asserts that Linneweber filed the charges against him based on a "tainted investigation," at the urging of an attorney who had a financial interest in the case, and notwithstanding a "conflict of interest." However, the District Court made no such findings. In fact, with regard to the alleged conflict, the court found exactly the opposite (i.e., that there was none), and the record supports the court on this point. In his deposition, Linneweber states that he requested assistance from the Attorney General's Office not because of a conflict of interest involving Passmore or C.R., but because he had had "negative interactions" with C.R. "on a personal level." He was concerned that she and J.R. would not "trust, believe, and cooperate" with him in the prosecution. Furthermore, when asked flat out, Linneweber emphatically denies that he filed the charges against Passmore to facilitate C.R.'s ability to pay the "miniscule" $375 he was seeking in the small-claims suit. Linneweber explains that he only filed that suit because C.R. had been "very stubborn and very rude to my wife and to my stepdaughter and we didn't feel it was appropriate to simply throw away the money, and that's why we went forward. We just didn't feel like she should be rewarded by us walking away."

27

¶48    Aside from the lack of factual support, Passmore's argument fails for two other reasons. First, it lacks legal support. This Court measures prosecutorial misconduct by reference to established norms of professional conduct. *State v. Martin*, 2001 MT 83, ¶ 63, 305 Mont. 123, 23 P.3d 216. Passmore, however, has cited no cases or professional standards that define "conflict of interest" as he does here or that prohibit a prosecutor from filing charges under the circumstances Linneweber did here. Indeed, Passmore appears to be grasping at straws with this theory. Second, Passmore has not established prejudice. As the State points out, even if Linneweber did have a conflict of interest when he requested leave to file the Information, Passmore was not tried under that Information. Rather, he was tried under the Amended Information filed by Carlo Canty (with leave of the District Court) 14 months later.

¶49    For the foregoing reasons, we conclude that the District Court did not err in denying Passmore's motion to dismiss based on prosecutorial misconduct.

¶50    ***Issue 3. Did the District Court abuse its discretion in disallowing extrinsic evidence of prior statements allegedly made by one of the victims?***

### I. Standard of Review

¶51    A trial court has broad discretion in determining the relevance and admissibility of evidence. *State v. Hicks*, 2006 MT 71, ¶ 19, 331 Mont. 471, 133 P.3d 206. Thus, we generally review evidentiary rulings for an abuse of discretion. *State v. Bomar*, 2008 MT 91, ¶ 14, 342 Mont. 281, 182 P.3d 47; *State v. Herman*, 2009 MT 101, ¶ 19, 350 Mont. 109, 204 P.3d 1254. A court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in

28

substantial injustice. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. In exercising its discretion, however, the court is bound by the Rules of Evidence or applicable statutes. Thus, to the extent a trial court's ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo. *Derbyshire*, ¶ 19; *Bomar*, ¶ 14.

## II. Background

¶52 During trial, Passmore attempted to introduce evidence that C.R. had told people she fantasized about being wrapped up with duct tape and tickled. He initially broached the subject during his cross-examination of C.R.:

> Q. Now, you talked to some people from the church, in 1998, and told them what you allege Terry did to you. Do you recall that?
> A. I recall being asked to write a statement. As far as talking to people, I couldn't recall what was said. I wasn't in a very good state of mind, at that point in time.
> Q. So, the written account of that meeting with the church officials is not something that you've seen recently.
> A. I have never seen it.
> Q. Never seen it. Do you recall telling the church officials that you had fantasized about being wrapped up with duct tape and tickled?
> A. I don't believe so, no.
> Q. Do you remember telling other people that?
> A. I believe, where the duct tape story came from was when I was about eight years old I had a neighbor who was kind of rowdy, in the navy, and me and sister wouldn't leave him alone, so he duct taped me so I couldn't bother him anymore. I might have told somebody that story, maybe Terry or Levi, but it was never a fantasy of mine.
> Q. I'm not trying to get into your fantasies.
> A. That's what you said.
> Q. Is it Ms. [R.]?
> A. Yes.
> Q. Ms. [R.], I'm just asking you if you told people.
> A. No, I've never told anybody that was my fantasy.
> Q. So, you say you might have told Levi and Terry about that, but you didn't tell them about fantasizing about it.
> A. No.

29

¶53 Passmore later revisited this subject during his direct examination of Levi Haefs. Haefs had attended the Livingston Church of God during the period when Passmore was pastor and had helped with the construction of the shed next to the parsonage in 1998. Haefs was 13 years old back then and had been friends with C.R. Passmore asked Haefs whether he ever heard C.R. "describing anything that she had thought about regarding duct tape." Haefs answered affirmatively and stated that this had occurred while he, C.R., and Passmore were doing work on the shed. After the prosecution twice objected to this line of questioning, the court held an in-chambers conference (with counsel, Passmore, and Haefs present), at which Passmore made the following offer of proof:

> Q.    Levi, first of all, is there anything else, in addition to what you've already said, out there, as far as who was there and how it got brought up? In fact, you were starting to tell us how it had gotten brought up, when we had to stop. So, let's have you finish with that. How did it get brought up in the first place?
> A.    I believe it was something fairly innocent, as in [C.R.] asking me if I'm ticklish.
> Q.    Alright. Then what happened?
> A.    Then she said that she wished that she could be bound with duct tape and tickled with a feather, naked.
> Q.    Was that the whole extent of her statement?
> A.    That was it.

¶54 The prosecutor opined that this would be inadmissible hearsay, but Passmore explained that C.R.'s statement to Haefs was being offered "not to prove that that's what she really wanted, but to prove that that's what she really said." He asserted that it was evidence of a prior inconsistent statement (which by definition is not hearsay, *see* M. R. Evid. 801(d)(1)(A)), and he argued that he should be allowed to present this testimony to the jury because it contradicted C.R.'s earlier testimony and thereby called

her credibility into question. The prosecutor, however, contended that the testimony was being offered simply to besmirch C.R.'s character, and he questioned whether it was barred by the rape shield law (§ 45-5-511(2), MCA). He also argued that the evidence, in any event, had very little probative value and was unfairly prejudicial.

¶55 The District Court ultimately decided to exclude the evidence. Relying on *State v. Detonancour*, 2001 MT 213, 306 Mont. 389, 34 P.3d 487, the court reasoned that "[a]n examination of the nuances of the victim's nonsexual interactions, and I'm going to add where the defendant was present, would effectively put the victim on trial." Furthermore, relying on *State v. Higley*, 190 Mont. 412, 621 P.2d 1043 (1980), the court reasoned that "the character of the victim is not at issue and her sexual views are not probative of her truthfulness." The court concluded that "it's clearly within my discretion to exclude this evidence because it's very, very prejudicial."

### III. Arguments and Analysis

¶56 On appeal, Passmore contends that the District Court erroneously relied on the rape shield law (which we discussed in both *Detonancour* and *Higley*) in disallowing the proffered testimony by Haefs. The rape shield law states that evidence concerning the "sexual conduct" of the victim is inadmissible in sex-crime prosecutions (except in narrow circumstances), *see* § 45-5-511(2), MCA, and we have previously rejected a broad definition of "sexual conduct," *see Detonancour*, ¶¶ 23-24 (declining to adopt a proposed definition that included "lingering touches, smoldering glances, the surreptuous [sic] passing of notes, casual contact between persons at social gatherings, and other methods of flirtatious behavior which form the invitation to engage in consensual sexual

31

contact or sexual intercourse"). Yet, as the State points out, the District Court characterized Haefs' proffered testimony as describing a "nonsexual interaction," not "sexual conduct." Thus, the issue here is whether the court's ruling conforms to the Rules of Evidence, not the rape shield law.[8]

¶57 In this regard, Passmore contends that Haefs' testimony was admissible "as a prior inconsistent statement on the issue of C.R.'s character for truthfulness." In addition, he contends that the testimony was relevant because "[C.R.'s] allegations against Passmore involved tickling—if she imagined scenarios that included tickling it supports Passmore's assertion that she made the stories up." Passmore argues that this case was "a contest between the credibility of the complainants and the defendant" and thus he should have been allowed to "expos[e] a prior inconsistent statement that would have impeached [C.R.'s] credibility and explained the source of her allegations against Passmore."

---

[8] Passmore also cites his constitutional right of confrontation. In response, the State contends that he did not present a constitutional challenge in the District Court. *See State v. Morrison*, 2008 MT 16, ¶ 10, 341 Mont. 147, 176 P.3d 1027 (issues presented for the first time on appeal are untimely). Furthermore, citing *State v. Wilson*, 2007 MT 327, ¶ 45, 340 Mont. 191, 172 P.3d 1264, and *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 1732 (2006), the State points out that the Confrontation Clause permits trial judges to limit evidence based on concerns of repetitiveness, relevance, harassment, prejudice, or confusion of the issues. In response, Passmore suggests that "the substance" of his argument at trial included a constitutional challenge. That does not appear to be the case; but even if it were, he has failed to explain on appeal how the District Court's ruling was inconsistent with the principles stated in *Wilson* and *Holmes*. Moreover, although he offers *Holley v. Yarborough*, 568 F.3d 1091 (9th Cir. 2009), as supplemental authority, the *Holley* opinion actually underscores the inadequacy of his briefing here. *Holley* reflects a fact-intensive analysis of the relevance, probative value, and prejudicial value of the impeachment evidence, including the proportionality of the limits imposed by the trial court. *See id.* at 1099-1100. Passmore, however, simply relies on generalized assertions about the right to confront witnesses. This is insufficient under M. R. App. P. 12(1)(f). *See e.g. State v. White*, 2008 MT 464, ¶ 29, 348 Mont. 196, 199 P.3d 274. We accordingly will not address the right-of-confrontation issue any further.

¶58   In response, the State contends that the evidence in question was simply not probative of whether Passmore sexually assaulted and engaged in nonconsensual sexual intercourse with C.R.  The State argues that even if C.R. imagined scenarios that included tickling, this fact does not support Passmore's claim that she "made the stories up," given that Passmore acknowledged at trial that he had tickled her on more than one occasion.  Finally, the State asserts that the evidence was offered to impeach C.R. on a collateral matter, and the State maintains that the District Court properly excluded it under M. R. Evid. 403 for being substantially more prejudicial than probative.

¶59   Initially, we note that Passmore proposed to use Haefs' testimony to impeach C.R. by contradiction.   Impeachment by contradiction occurs when a party attacks the credibility of a witness by offering evidence to prove that a fact which the witness asserted or relied upon in her testimony is not true.  *Wegener v. Johnson*, 527 F.3d 687, 691 (8th Cir. 2008).  Contradiction evidence undermines credibility in two ways:  first, it permits the inference that the witness either lied or was mistaken with respect to the specific fact contradicted; and second, since contradiction tends to show that the witness erred or lied with respect to one fact, the jury could infer that the witness is generally an unreliable source of information and erred or lied with respect to other facts (the point Passmore sought to make using Haefs' testimony here).  *See* Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* vol. 27, § 6096, 656-57 (2d ed., West 2007).  Of course, this inference is not always warranted.  For example, a witness might make a mistake in recalling a trivial detail (e.g., the color of socks he was wearing on the date in question) but still be able to testify accurately as to more significant details

(e.g., that he observed the defendant attack the victim). *See id.* at 657. Also, the costs and dangers associated with contradiction evidence can be high. For example, where the contradicted fact is immaterial, the jury could become distracted and confused by the attention given to the contradiction and may attach undue importance to extraneous matters. The jury could also be inclined to misuse evidence when the contradiction reveals prejudicial facts about a witness (as the State suggests could have happened here). Furthermore, time may be wasted pursuing contradictions that reveal nothing directly about the facts in issue and little about the credibility of the witnesses. *See id.* at 658; Kenneth S. Broun, *McCormick on Evidence* vol. 1, § 45, 214-15 (6th ed., West 2006).

¶60    For these reasons, courts long have held that when contradiction concerns a "collateral matter" (i.e., a matter that is not relevant for a purpose other than to contradict a witness's in-court testimony), the contradiction may be proved only through the testimony of the witness to be impeached, and extrinsic evidence (i.e., evidence offered through other witnesses, rather than through the witness to be impeached) is inadmissible to contradict the witness on the collateral matter. *See* Wright & Gold, *Federal Practice and Procedure* § 6096, at 659; Broun, *McCormick on Evidence* § 49, at 232; *United States v. Mulinelli-Navas*, 111 F.3d 983, 988 (1st Cir. 1997); *United States v. Hayes*, 369 F.3d 564, 567 (D.C. Cir. 2004); *Jezdik v. State*, 110 P.3d 1058, 1063 (Nev. 2005). Thus, only contradictions as to noncollateral matters[9] may be proved both by extrinsic evidence

---

[9] There are three generally recognized categories of noncollateral facts: facts that are admissible to prove substantive issues in the case; facts that are admissible to impeach or disqualify the witness on grounds other than contradiction (e.g., bias); and any part of the witness's account of the background and circumstances of a material transaction

and by the testimony of the witness himself. Wright & Gold, *Federal Practice and Procedure* § 6096, at 659. It should be noted that this "collateral-fact rule" (barring extrinsic contradictory evidence concerning a collateral matter) does not apply to attacks on a witness's bias, interest, corruption, coercion, mental or perceptual capacity, or lack of personal knowledge or to impeachment using a prior conviction. Rather, it applies to impeachment using a prior inconsistent statement, impeachment using an untruthful act that has not resulted in a conviction, and specific contradiction. *See id.* at 659 n. 14, 661; Broun, *McCormick on Evidence* § 49, at 233-37; *Jezdik*, 110 P.3d at 1064.

¶61 It has been suggested that the collateral-fact rule is too mechanistic and that the better approach is to apply the discretionary balancing of Fed. R. Evid. 403. *See* Broun, *McCormick on Evidence* § 49, at 237; *see also* Wright & Gold, *Federal Practice and Procedure* § 6096, at 662-64. Notably, a number of federal courts have determined that Rule 607 authorizes impeachment by contradiction and Rule 403 governs its application. *See United States v. Gilmore*, 553 F.3d 266, 271 (3d Cir. 2009); *United States v. Castillo*, 181 F.3d 1129, 1132-33 (9th Cir. 1999); *see also United States v. Fonseca*, 435 F.3d 369, 375 (D.C. Cir. 2006); 28 U.S.C. app. Fed. R. Evid. 608, Advisory Committee Notes on 2003 Amendment, at 346 (2006). Such an approach is suggested for Montana courts in the Commission Comments to M. R. Evid. 607:

> The many cases considering collateral matters indicate that it is a troublesome doctrine. The Commission believes that the limitation of

which as a matter of human experience he would not have been mistaken about if his story were true (e.g., the fact that the accident at issue occurred during a blizzard on a moonless night, rather than on a sunny day as the witness described). *See* Wright & Gold, *Federal Practice and Procedure* § 6096, at 659-62.

impeachment by Rule 401, defining relevant evidence as including impeaching evidence, and Rule 403, allowing the court to exclude relevant evidence if its probative value is outweighed by prejudice, confusion or waste of time, will allow the same result to be reached through a more flexible means than currently used with the collateral matters rule.

We agree with these comments and conclude that while the collateral or noncollateral nature of the evidence at issue may be a factor to consider, the admissibility and use of contradiction evidence (whether extrinsic or the testimony of the witness himself) is to be governed by M. R. Evid. 401[10] and 403[11] and any other applicable rule of evidence. This is consistent with our approach of eschewing common law doctrines of evidence and instead using the specific statute or rule of evidence that applies to the particular factual situation presented in order to determine the admissibility of the evidence at issue. *See e.g. State v. Hansen*, 1999 MT 253, ¶¶ 72-84, 296 Mont. 282, 989 P.2d 338. Rule 403 identifies the factors pertinent to determining the admissibility of contradiction evidence, and the trial court must carefully apply those factors in deciding whether and to what extent such evidence may be introduced.

¶62 Here, Passmore argues that Haefs' proffered testimony about what C.R. told him is evidence of a prior inconsistent statement. M. R. Evid. 801(d)(1)(A) provides that a prior oral or written statement inconsistent with the declarant's trial testimony is

---

[10] "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant." M. R. Evid. 401.

[11] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M. R. Evid. 403.

admissible, and M. R. Evid. 613(b) provides that extrinsic evidence of a prior inconsistent statement is admissible so long as the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon. "The attack by prior inconsistent statement is not based on the theory that the present testimony is false and the former statement true. Rather, the attack rests on the notion that talking one way on the stand and another way previously is blowing hot and cold, raising a doubt as to the truthfulness of both statements." Broun, *McCormick on Evidence* § 34, at 151; *see also United States v. Winchenbach*, 197 F.3d 548, 558 (1st Cir. 1999) (explaining that Rule 613(b) permits extrinsic evidence of a prior inconsistent statement to show that a witness's statement at trial is irreconcilably at odds with the one made previously, thus calling the declarant's credibility into question, but Rule 608(b) bars extrinsic evidence of specific instances of a witness's conduct offered to impugn his character for truthfulness).

¶63    Of course, as just explained, the admissibility of such evidence is also subject to Rule 403, and that is where Passmore's claim fails. We agree with the State that the evidence in question (that C.R. told Haefs she wished she could be bound with duct tape and tickled with a feather naked) was unfairly prejudicial. Indeed, it effectively would have put C.R. on trial, *cf. Detonancour*, ¶ 24, and it easily could have caused the jury to attach undue importance to an extraneous and prejudicial matter. Moreover, this evidence would have been cumulative insofar as Passmore was able to present other evidence from which he then argued to the jury that C.R. had "made up" the allegations against him. *See* ¶ 34 n. 6, *supra*. And in terms of undermining C.R.'s credibility, the

37

evidence had limited probative value in establishing the inference that because C.R. erred or lied with respect to what she told Haefs, she erred or lied with respect to her testimony about Passmore's sexual acts with her.[12]  In short, the probative value of Haefs' proffered testimony was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and needless presentation of cumulative evidence.

¶64  A trial court has broad discretion to exclude evidence under M. R. Evid. 403.  *See State v. McClean*, 179 Mont. 178, 186, 587 P.2d 20, 25 (1978); *State v. Grixti*, 2005 MT 296, ¶ 22, 329 Mont. 330, 124 P.3d 177, *overruled in part on other grounds*, *Whitlow v. State*, 2008 MT 140, ¶ 18 n. 4, 343 Mont. 90, 183 P.3d 861.  Passmore has not shown that the District Court abused that discretion.  We accordingly affirm the court's ruling.

¶65  ***Issue 4.  Did the District Court abuse its discretion in excluding testimony from a defense witness that Passmore lacked the character traits of a sex offender?***

¶66  The standard of review here is the same as under Issue 3.  *See* ¶ 51, *supra*.

¶67  Prior to trial, Passmore disclosed his intention to call sex-offender evaluator Michael D. Sullivan, MSW, "to testify as an expert witness in the instant case, inasmuch as Mr. Sullivan conducted an evaluation of Mr. Passmore, which revealed that he does not have the characteristics of a sex offender as a result of an extensive assessment."  The State responded with a motion in limine to exclude this proposed expert testimony based

---

[12] Passmore's reliance on *People v. Garcia*, 179 P.3d 250 (Colo. App. 2007), is unavailing.  In *Garcia*, the court ruled that the victim's alleged rape fantasy, which she had shared with the defendant, was material and relevant because his defense was that the victim had consented to the sexual intercourse.  *See* 179 P.3d at 256.  Here, by contrast, C.R. was incapable of giving legal consent, *see* §§ 45-5-501(1)(b)(iii), -502(5), MCA (1997), and so her alleged tickling fantasy was not probative in the way the rape fantasy was in *Garcia*.

on M. R. Evid. 702 and *State v. Bailey*, 2004 MT 87, 320 Mont. 501, 87 P.3d 1032. The District Court held a hearing and thereafter granted the State's motion.

¶68 On appeal, Passmore notes that he did not offer this testimony for purposes of bolstering his own credibility. Rather, he offered Sullivan's testimony pursuant to M. R. Evid. 404(a), 405(a), 702, and 704. In relevant part, these rules state as follows:

> Rule 404(a): "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: (1) Character of accused. Evidence of a pertinent trait of character offered by an accused . . . ."

> Rule 405(a): "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made . . . by testimony in the form of an opinion."

> Rule 702: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

> Rule 704: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Based on these provisions and several cases from other jurisdictions, Passmore maintains that expert testimony regarding whether a defendant possesses the character traits of a sex offender is admissible.

¶69 The chief case relied on by Passmore is *State v. Davis*, 645 N.W.2d 913 (Wis. 2002). Similar to the present case, the defendant in *Davis* sought to introduce evidence to show that he lacked the psychological characteristics of a sex offender and, therefore, was unlikely to have committed the charged crime. The court held that such evidence "may be admissible" under Wisconsin's rules of evidence governing character evidence

and expert testimony (which are identical in pertinent respects to the Montana rules quoted above). *See Davis*, ¶¶ 2, 26. The court first observed that an accused may introduce evidence of a "pertinent" trait of his character, meaning the character evidence must relate to a fact or proposition that is of consequence to the determination of the action and have a tendency to establish that consequential proposition. Next, the court noted that a defendant may introduce such relevant character evidence through opinion testimony. Lastly, the court observed that expert testimony is permitted when specialized knowledge will assist the trier of fact to understand evidence or to determine a fact in issue. *See Davis*, ¶¶ 16-17. From this, the court reasoned on the facts presented:

> Davis's expert will allegedly testify to the general character traits of sexual offenders, the tests used to determine whether an individual possesses such character traits, his findings on whether Davis possesses such character traits, and, based on these results, the likelihood that Davis committed the sexual assault. Such traits regarding the defendant's propensity to commit sexual assault are pertinent traits of his character. This evidence relates to a consequential fact, that is, whether the defendant committed sexual misconduct with a child. Further, this evidence has probative value in sexual assault cases, where there is often no neutral witness to the assault and there is seldom any physical evidence implicating the defendant. Such profile evidence may be extremely important to the defense. Such testimony may also be useful to the trier of fact, helping it to determine a fact in issue, that is, whether the defendant committed the crime, by showing circumstantial evidence of the defendant's innocence.

*Davis*, ¶ 18. The court noted, however, that the trial court has "discretion in admitting such evidence" and is entrusted to act as a gatekeeper with the power to exclude "unduly prejudicial evidence." *See Davis*, ¶ 21; *see also State v. Walters*, 675 N.W.2d 778, ¶¶ 2, 24, 25, 28 (Wis. 2004) (such evidence is subject to the rules of evidence, particularly rule 403's balancing test, and the decision to admit or exclude it is discretionary).

¶70    Passmore also cites *People v. Stoll*, 783 P.2d 698 (Cal. 1989), and *Nolte v. State*, 854 S.W.2d 304 (Tex. App. 3d Dist. 1993).  In *Stoll*, the court reversed the convictions because the trial court had erroneously excluded a defense psychologist's opinion testimony that the defendants displayed a "normal personality function" and showed no "indications of deviancy."  783 P.2d at 699-700, 707-08.  The court observed that under California's rules of evidence, an accused may present expert opinion testimony to show his nondisposition to commit a charged sex offense.  *Id.* at 708.  In this regard, the court noted that "lack of deviance" is a relevant character trait in a lewd-and-lascivious-conduct case.  *Id.*  In contrast, the court in *Nolte* concluded that the proffered testimony, which would have compared the defendant's psychological profile with that of the typical sexual abuser, simply was not character evidence under Tex. R. Crim. Evid. 405(a) and, thus, should not have been excluded under this rule.  854 S.W.2d at 308-10.

¶71    The State counters that more courts have rejected "sex-offender profile testimony" than have allowed it.  As support for this proposition, the State directs our attention to *People v. Dobek*, 732 N.W.2d 546, 575 (Mich. App. 2007) (listing courts that have rejected such testimony), and James Aaron George, Student Author, *Offender Profiling and Expert Testimony: Scientifically Valid or Glorified Results?* 61 Vand. L. Rev. 221, 240 n. 109 (2008) (listing jurisdictions that have rejected sex-offender profiling offered by the prosecution and jurisdictions that have rejected sex-offender profiling offered by the defendant).  In *State v. Parkinson*, 909 P.2d 647 (Idaho App. 1996) (cited in *Dobek*), the court noted that "[v]arious reasons have been given for rejection of this type of evidence, including that it has not gained general acceptance in the scientific community,

that it invades the province of the jury and unfairly prejudices the prosecution, and that it does not assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 651; *see also State v. Hughes*, 841 So. 2d 718, 721 (La. 2003). The *Dobek* court cited similar reasons in its decision. The court first concluded that evidence regarding the defendant's sex-offender profile did not meet the requirements of Mich. R. Evid. 702. Specifically, the court held that the proffered testimony was not sufficiently scientifically reliable and was not supported by sufficient scientific data. *Dobek*, 732 N.W.2d at 571-72. The court also concluded that the evidence would not assist the trier of fact in understanding the evidence or in determining a fact in issue, but rather would more likely confuse the jury and distract it from focusing on the pertinent evidence. *Id.* at 572. Thus, the court held that even if the evidence were admissible under Mich. R. Evid. 702, any minimal probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *Id.* In this regard, the court expressed concern that the evidence, purporting to answer the question of whether the defendant committed a sexual offense, could be given disproportionate weight by the jury and considered conclusive proof of guilt or innocence. *Id.*

¶72 These extrajurisdictional cases aside, the State also argues that under *State v. Spencer*, 2007 MT 245, 339 Mont. 227, 169 P.3d 384, the District Court did not abuse its discretion in excluding Sullivan's proposed testimony because its probative value was substantially outweighed by the danger of confusing the issues or misleading the jury. In *Spencer*, the defendant was accused of having sexual intercourse without consent with two young girls, and he sought to introduce testimony by a licensed clinical psychologist

42

that he did not meet the diagnostic criteria of a pedophile. *Spencer*, ¶¶ 6, 9-10. We affirmed the exclusion of this evidence, noting that it was "pertinent character evidence," *Spencer*, ¶ 37, but concluding that "whatever relevance [the] testimony may have possessed, the dangers of confusing the issues or misleading the jury substantially outweighed its probative value, and thus it ran afoul of M. R. Evid. 403," *Spencer*, ¶ 41.

¶73 Based on *Spencer* and the extrajurisdictional cases cited by Passmore and the State, we conclude that there is neither a per se rule requiring admission, nor a per se rule requiring exclusion, of evidence that a defendant does not possess (or does possess[13]) the character traits of a sex offender. Rather, admissibility depends on a careful application of M. R. Evid. 403, 404(a)(1), 405(a), and 702. In the present case, Passmore forcefully argues that Sullivan's testimony was admissible under Rules 404(a)(1) and 405(a). However, he fails to provide any analysis, let alone a complete record,[14] on the question of whether Sullivan's testimony would meet the requirements of Rule 702. Insofar as Rule 702 is concerned, Passmore's argument is insufficient under M. R. App. P. 12(1)(f). Furthermore, we agree with the State that the District Court was well within its discretion in concluding that on the facts here, any probative value Sullivan's testimony may have had was substantially outweighed by the danger of confusing the issues or misleading the jury. M. R. Evid. 403; *cf. Spencer*, ¶ 41.

---

[13] Under M. R. Evid. 404(a)(1), evidence of a pertinent trait of character of the accused is admissible if offered by the accused, "or by the prosecution *to rebut the same*" (emphasis added).

[14] The appellant has the duty to present this Court with a record sufficient to enable it to rule upon the issues raised. M. R. App. P. 8(2).

¶74 Passmore has not shown that the District Court abused its discretion in excluding testimony from Sullivan that Passmore lacked the character traits of a sex offender. We accordingly affirm the court's ruling.

**CONCLUSION**

¶75 The District Court did not err in denying Passmore's motion to dismiss the prosecution on the grounds of preaccusation delay and in denying his motion to dismiss the prosecution on the grounds of prosecutorial misconduct. Likewise, the court did not abuse its discretion in disallowing extrinsic evidence of prior statements allegedly made by C.R. and in excluding testimony from Sullivan that Passmore lacked the character traits of a sex offender.

¶76 Affirmed.

/S/ JAMES C. NELSON

We concur:

/S/ PATRICIA O. COTTER

/S/ JIM RICE

/S/ BRIAN MORRIS

44